**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JAMES OWENS, et al.,** | |
| Plaintiffs, | |
| v. | Civil Action No. 01-2244 (JDB) |
| **REPUBLIC OF SUDAN, et al.,** | |
| Defendants. | |
| **WINFRED WAIRIMU WAMAI, et al.,** | |
| Plaintiffs, | |
| v. | Civil Action No. 08-1349 (JDB) |
| **REPUBLIC OF SUDAN, et al.,** | |
| Defendants. | |
| **MILLY MIKALI AMDUSO, et al.,** | |
| Plaintiffs, | |
| v. | Civil Action No. 08-1361 (JDB) |
| **REPUBLIC OF SUDAN, et al.,** | |
| Defendants. | |
| **JUDITH ABASI MWILA, et al.,** | |
| Plaintiffs, | |
| v. | Civil Action No. 08-1377 (JDB) |
| **ISLAMIC REPUBLIC OF IRAN, et al.,** | |
| Defendants. | |

| | |
|---|---|
| **MARY ONSONGO, et al.,** | |
| **Plaintiffs,** | |
| v. | **Civil Action No. 08-1380 (JDB)** |
| **REPUBLIC OF SUDAN, et al.,** | |
| **Defendants.** | |
| **RIZWAN KHALIQ, et al.,** | |
| **Plaintiffs,** | |
| v. | **Civil Action No. 10-356 (JDB)** |
| **REPUBLIC OF SUDAN, et al.,** | |
| **Defendants.** | |
| **MONICAH OKOBA OPATI, et al.,** | |
| **Plaintiffs,** | |
| v. | **Civil Action No. 12-1224 (JDB)** |
| **REPUBLIC OF SUDAN, et al.,** | |
| **Defendants.** | |

## <u>MEMORANDUM OPINION</u>

On August 7, 1998, the United States embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania, were devastated by the nearly simultaneous detonations of a pair of truck bombs. More than 200 people were killed, including 12 Americans, and thousands were injured. There is no doubt the attacks were the work of al Qaeda, a grisly precursor to the bombing of the U.S.S. Cole and the atrocities of September 11, 2001.

Starting in 2001, various groups of plaintiffs—comprising individuals directly injured in the two embassy bombings, estates of individuals who were killed, and family members of the wounded and dead—filed lawsuits against the Republic of Sudan and the Islamic Republic of Iran,

charging those nations with responsibility for the attacks.  With respect to Sudan, the only defendant relevant for present purposes, the essence of the plaintiffs' allegations was that Sudan had given Osama bin Laden and al Qaeda safe haven throughout the mid-1990s, as well as other forms of assistance, and that this support had allowed al Qaeda to grow, train, plan, and eventually carry out the 1998 embassy attacks.  In the plaintiffs' view, this support of al Qaeda was sufficient both to divest Sudan of the immunity generally granted to foreign states by the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1602 et seq., and also to render it liable for the plaintiffs' physical and emotional injuries stemming from the attacks.

Sudan hired U.S. counsel and defended against the first of these lawsuits in its early stages. But even as this Court denied its repeated requests that the suit be dismissed, Sudan stopped paying and communicating with its lawyers, and eventually ignored the case entirely.  Sudan never participated at all in the six other cases at issue here.  Because the FSIA requires plaintiffs to substantiate their claims with evidence even when a foreign sovereign defaults, in October 2010 the Court held a three-day hearing at which the plaintiffs presented a range of evidence about the bombings and Sudan's relationship with al Qaeda.  Roughly a year later, the Court issued an opinion in which it concluded that Sudan had indeed provided material support to al Qaeda, was not entitled to sovereign immunity, and was liable for the plaintiffs' injuries.  The Court then referred the hundreds of claims to special masters, who heard evidence relevant to individual plaintiffs' damages, reported their findings to the Court, and recommended awards.  Between March and October of 2014, the Court entered final judgments against Sudan in all seven cases, awarding a total of over $10 billion in compensatory and punitive damages.

One month after the entry of the first of these final judgments, Sudan reappeared with new counsel and began to participate in the litigation.  Sudan first filed notices of appeal in all seven

cases.  Then, in April 2015, it filed with this Court motions to vacate all of the judgments pursuant to Federal Rule of Civil Procedure 60(b).  The Court of Appeals ordered the appeals held in abeyance pending this Court's resolution of the motions to vacate, which are now ripe for decision.

The Court will deny Sudan's motions in all respects.  Sudan's years of total nonparticipation in this litigation, despite full awareness of its existence, cannot be justified as "excusable neglect."  Nor did this Court lack subject-matter jurisdiction for any of the reasons Sudan offers: these bombings were acts of "extrajudicial killing" within the meaning of the jurisdictional provision; there was sufficient evidence of the necessary jurisdictional facts; and the jurisdictional provision extends to claims of emotional harms by immediate family members. Sudan's nonjurisdictional arguments also fail: some are without merit, and for those with some heft, Sudan fails to explain what would justify relief from a final judgment.

Perhaps Sudan could have prevailed in these cases, fully or partially, if it had defended in a timely fashion.  But, as a result of either deliberate choice or inexcusable recklessness, it did not do so.  Either way, Sudan has no one to blame for the consequences but itself.

## BACKGROUND

### STATUTORY BACKGROUND

Because many of the issues Sudan has raised in its vacatur motions concern the proper interpretation of the Foreign Sovereign Immunities Act (FSIA), and because Congress amended the FSIA significantly during the long course of this litigation, the Court begins with a brief overview of the Act and its history.

Enacted in 1976, "the FSIA provides the sole basis for obtaining jurisdiction over a foreign state in federal court."  Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 439 (1989).  The Act provides that federal district courts shall have jurisdiction over civil claims against

foreign states "with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of [Title 28] or under any applicable international agreement."  28 U.S.C. § 1330(a).  Subject-matter jurisdiction is thus intertwined with immunity: insofar as a foreign sovereign defendant is entitled to immunity, a federal court lacks subject-matter jurisdiction to hear claims against it.  Verlinden B.V. v. Cent. Bank of Nigeria, 461 U.S. 480, 493 (1983).  And § 1604 provides that foreign states are generally entitled to immunity, subject to specific statutory exceptions, most notably those contained in § 1605.  28 U.S.C. §§ 1604–1605.

As originally enacted, § 1605's exceptions generally codified the "restrictive" theory of foreign sovereign immunity, under which "immunity is confined to suits involving the foreign sovereign's public acts, and does not extend to cases arising out of a foreign state's strictly commercial acts."  Verlinden, 461 U.S. at 487–88.  None of the original immunity exceptions overtly had anything to do with terrorism or human rights abuses.  In 1996, however, Congress enacted § 1605(a)(7), commonly referred to as the "terrorism exception" to foreign sovereign immunity.  Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 221, 110 Stat. 1214, 1241–43 ("Jurisdiction for Lawsuits Against Terrorist States").  Subject to certain exceptions, that provision removed immunity in cases

> in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources (as defined in section 2339A of title 18) for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605(a)(7) (2006).  Only foreign states designated as state sponsors of terrorism under certain federal statutes could be sued under this provision.  Id. § 1605(a)(7)(A).  And a suit could not proceed if "neither the claimant nor the victim was a national of the United States . . . when the act upon which the claim [was] based occurred."  Id. § 1605(a)(7)(B)(ii).

Like the other provisions in § 1605, subsection (a)(7) eliminated immunity and thereby created federal jurisdiction for a certain set of claims, but it did not provide plaintiffs with a federal cause of action.  Cicippio-Puleo v. Islamic Republic of Iran, 353 F.3d 1024, 1032 (D.C. Cir. 2004); see also Republic of Austria v. Altmann, 541 U.S. 677, 695 n.15 (2004) ("The [FSIA] does not create or modify any causes of action . . . .").  Shortly after the enactment of § 1605(a)(7), however, in what is frequently called the "Flatow Amendment," Congress did create a related federal cause of action.  The Flatow Amendment provided that

> an official, employee, or agent of a foreign state designated as a state sponsor of terrorism . . . while acting within the scope of his or her office, employment, or agency shall be liable to a United States national or the national's legal representative for personal injury or death caused by acts of that official, employee, or agent for which the courts of the United States may maintain jurisdiction under section 1605(a)(7) of title 28.

Pub. L. No. 104-208, § 589, 110 Stat. 3009, 3009-172 (1996).  Although several district courts initially held that the Flatow Amendment created a cause of action against foreign states, in 2004 the D.C. Circuit clarified that the statute "only provides a private right of action against officials, employees, and agents of a foreign state, not against the foreign state itself."  Cicippio-Puleo, 353 F.3d at 1033.  After Cicippio-Puleo, plaintiffs suing foreign states under § 1605(a)(7), like those suing under the FSIA's other immunity exceptions, generally had to rely on state law for causes of action.  See, e.g., Holland v. Islamic Republic of Iran, 496 F. Supp. 2d 1, 23–24 (D.D.C. 2005).

In the National Defense Authorization Act (NDAA) of 2008, Congress significantly amended the terrorism-related provisions of the FSIA.  Pub. L. No. 110-181, § 1083, 122 Stat. 3, 338–44.  Section 1605(a)(7) was struck, and an entirely new section, § 1605A, was enacted.  Section 1605A, entitled "Terrorism exception to the jurisdictional immunity of a foreign state," contains several provisions relevant here.  Subsection (a) contains an immunity exception that closely tracks the repealed § 1605(a)(7).  Subsection (b), in conjunction with § 1083(c) of the 2008

NDAA, establishes a somewhat convoluted statute of limitations.  And subsection (c) supersedes Cicippio-Puleo by creating a federal cause of action for certain plaintiffs against foreign states (and their agents) that engage in, or provide material support for, the four predicate acts for which immunity is not provided (torture, extrajudicial killing, hostage taking, and aircraft sabotage).  The Court will examine these provisions in greater detail as they become relevant to Sudan's arguments.

### PROCEDURAL BACKGROUND

James Owens, a U.S. citizen injured in the Dar es Salaam attack, filed the first of the seven cases at issue here on October 26, 2001.  Compl. [Owens ECF No. 1].  Owens was eventually joined by several dozen co-plaintiffs, some of whom had been directly injured or killed in the embassy bombings, and some of whom were family members of those directly harmed.  They brought suit against Sudan and Iran (as well as Sudan's Ministry of the Interior and Iran's Ministry of Information and Security), whom they alleged had provided support to the terrorists who carried out the attacks.  Am. Compl. [Owens ECF No. 4].  The plaintiffs sought to recover for the physical injuries (or death) inflicted on those present during the attacks and also for the emotional injuries suffered by both those direct victims and their relatives.

Initially, neither Sudan nor Iran appeared in Owens, and in May 2003 the Court entered defaults against them.  Order of May 8, 2003 [Owens ECF No. 11].  In February 2004, however, Sudan retained U.S. counsel and began to participate in the litigation.  Notice of Appearance [Owens ECF No. 43].  Sudan quickly moved to vacate the default and to dismiss the case, raising a host of arguments, most notably that it was immune under the Foreign Sovereign Immunities Act.  Mot. to Dismiss [Owens ECF No. 49].  In March 2005 the Court granted in part and denied in part Sudan's motion.  Owens v. Republic of Sudan, 374 F. Supp. 2d 1 (D.D.C. 2005) ("Owens

I").  Although the Court rejected most of Sudan's arguments, it concluded that the plaintiffs' existing allegations were insufficient to show that the immunity exception in § 1605(a)(7) applied to Sudan.  Id. at 14–15, 17–18.  But the Court felt that the plaintiffs could overcome these pleading failures and therefore gave them leave to file an amended complaint.  Id.

The plaintiffs did so, Sudan again moved to dismiss, and the Court denied its motion.  Owens v. Republic of Sudan, 412 F. Supp. 2d 99 (D.D.C. 2006) ("Owens II").  The applicability of § 1605(a)(7) was again the headline issue.  Although Sudan did not dispute that the embassy bombings were acts of "extrajudicial killing," it argued that the plaintiffs' allegations remained insufficient to show that Sudan had provided material support to al Qaeda or that there was a legally cognizable causal link between the alleged material support and the plaintiffs' injuries.  See id. at 106 & n.11.  The Court rejected these arguments, holding that the plaintiffs' amended complaint sufficiently alleged the provision of material support in various forms by Sudanese government officials acting in their official capacities, id. at 106–09, and that those allegations, if true, could justify the conclusion that Sudan's support caused the bombings, id. at 109–15.

During these two rounds of motion-to-dismiss proceedings, relations between Sudan and its U.S. counsel deteriorated.  In January 2005 Sudan's counsel informed the Court that Sudan had "made no payment for any of the legal services provided to date," and that there had been a "lack of effective communication from the client" on legal issues.  Mot. to Withdraw [Owens ECF No. 100] at 2.  Counsel's difficulties communicating with Sudanese officials persisted, and by late 2007 it appears that Sudan had stopped responding to counsel's communications entirely.  Mot. to Withdraw [Owens ECF No. 129] at 4.  Counsel apparently received an inquiry about the case from a Sudanese official on September 1, 2008, but there were no accompanying instructions and no follow-up.  Status Report [Owens ECF No. 144] at 3.

Despite the communication difficulties and eventual breakdown, Sudan's counsel continued to defend.  After the January 2006 denial of its second motion to dismiss, Sudan took an interlocutory appeal to the D.C. Circuit, which affirmed this Court's decision in July 2008. Owens v. Republic of Sudan, 531 F.3d 884 (D.C. Cir. 2008) ("Owens III").  As relevant here, Sudan again argued that the plaintiffs had "failed to plead sufficient facts to 'reasonably support a finding' that Sudan's material support of al Qaeda in the early 1990s caused the embassy bombings in Kenya and Tanzania in 1998."  Id. at 893–94.  The D.C. Circuit rejected this argument:

> Although Plaintiffs' allegations are somewhat imprecise as to the temporal proximity of Sudan's actions to and their causal connection with the terrorist act and do not chart a direct and unbroken factual line between Sudan's actions and the terrorist act, this imprecision is not fatal for purposes of jurisdictional causation so long as the allegations, and the reasonable inferences drawn therefrom, demonstrate a reasonable connection between the foreign state's actions and the terrorist act.

Id. at 895 (internal quotation marks omitted).  The court concluded that the allegations and reasonable inferences drawn therefrom did indeed demonstrate such a connection.  Id.

Within roughly a month of the D.C. Circuit's decision, four groups of plaintiffs filed four new lawsuits—Wamai, Amduso, Mwila, and Onsongo—against Iran and Sudan for their alleged roles in the embassy bombings.  Sudan did not appear to defend against these actions.  And in January 2009 the Court granted Sudan's counsel's request to withdraw in Owens.  Order of January 26, 2009 [Owens ECF No. 148].  From that point until April 2014, Sudan did not participate in any of these cases or communicate with the Court in any way.

A new default against Sudan was entered on March 25, 2010.  Entry of Default [Owens ECF No. 173].  The FSIA forbids the entry of a default judgment, however, "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e). Accordingly, in October 2010 the Court held a three-day evidentiary hearing in Sudan's absence. (By this time, a sixth case, Khaliq, had joined the group.)  The plaintiffs presented a wide range of

evidence—including live testimony (of both lay and expert witnesses), videotaped testimony, transcripts of testimony from other cases, affidavits, and U.S. government reports—concerning the embassy attacks and Sudan's relationship with al Qaeda.

In November 2011 the Court issued an opinion that presented its findings of fact and conclusions of law. Owens v. Republic of Sudan, 826 F. Supp. 2d 128 (D.D.C. 2011) ("Owens IV"). As a factual matter, the Court found that Sudan had provided safe harbor, as well as financial, military, and intelligence assistance, to al Qaeda, id. at 139–46, and that "Sudanese government support was critical to the success of the 1998 embassy bombings," id. at 146. Because this amounted to the provision of material support for acts of extrajudicial killing, under § 1605A(a) Sudan was not entitled to immunity. Id. at 148–51. The Court also clarified that while plaintiffs who were U.S. nationals or employees of the U.S. government (essentially everyone directly injured in the bombings) could recover under the federal cause of action provided by § 1605A(c), foreign family members of direct victims were not within the ambit of that provision, but could instead recover under the tort law of the District of Columbia. Id. at 151–57. The Court deemed Sudan's (and Iran's) fundamental liability established, but referred the hundreds of plaintiffs' claims to special masters, "who [would] receive evidence and prepare proposed findings and recommendations for the disposition of each individual claim in a manner consistent with [the Court's] opinion." Id. at 157.

The work of the special masters took several years, during which time a number of events worth noting occurred. First, the Court's November 2011 opinion was translated into Arabic and forwarded to the State Department to be served on Sudan through diplomatic channels. That service was effected in September 2012, when the U.S. embassy in Khartoum delivered the translated opinion to the Sudanese Ministry of Foreign Affairs. See Letter from William P. Fritzlen

[Owens ECF No. 282].  Also in 2012, two new sets of plaintiffs entered the picture.  One group filed a new case, Opati, the last of the seven at issue here.  The other—referred to as the "Aliganga plaintiffs" after Marine Sergeant Jesse Nathanael Aliganga, who was killed in the Nairobi attack— did not file a new case, but instead sought and received permission to intervene in Owens.  Order of July 3, 2012 [Owens ECF No. 233].  Because the Opati and Aliganga plaintiffs' claims arose from the same attacks for which the Court had already found Sudan liable (and Sudan again did not respond), the Court did not revisit the question of liability, and instead referred these plaintiffs' claims to special masters just as it had done in the other cases.  Order of July 31, 2012 [Owens ECF No. 236]; Opati v. Republic of Sudan, 60 F. Supp. 3d 68, 73–75 (D.D.C. 2014).

On March 28, 2014, having received and reviewed the special masters' reports, the Court issued final judgments awarding hundreds of millions of dollars to the plaintiffs in Owens,[1] Mwila, and Khaliq.  Mem. Op. of March 28, 2014 [Owens ECF No. 300] at 3 (over $487 million); Mwila v. Islamic Republic of Iran, 33 F. Supp. 3d 36, 40 (D.D.C. 2014) (over $419 million); Khaliq v. Republic of Sudan, 33 F. Supp. 3d 29, 32 (D.D.C. 2014) (over $49 million).  On July 25, 2014, the Court issued four more final judgments, bringing Wamai, Amduso, Onsongo, and Opati to a close.  Wamai v. Republic of Sudan, 60 F. Supp. 3d 84, 89 (D.D.C. 2014) (over $3.5 billion); Amduso v. Republic of Sudan, 61 F. Supp. 3d 42, 46 (D.D.C. 2014) (over $1.7 billion); Onsongo v. Republic of Sudan, 60 F. Supp. 3d 144, 148 (D.D.C. 2014) (over $199 million); Opati, 60 F. Supp. 3d at 76 (over $3.1 billion).  Finally, on October 24, 2014, the Court entered judgment in favor of the Aliganga plaintiffs, the eighth and last judgment at issue in these seven cases.  Owens v. Republic of Sudan, 71 F. Supp. 3d 252, 256 (D.D.C. 2014) (over $622 million).

---

[1] This judgment resolved only the claims of the original Owens plaintiffs, not those of the Aliganga plaintiffs. As such, it was not automatically a final judgment.  See Fed. R. Civ. P. 54(b).  On April 11, 2014, however, on the original plaintiffs' motion, the Court certified the judgment of March 28, 2014, as final pursuant to Federal Rule of Civil Procedure 54(b).  Order of April 11, 2014 [Owens ECF No. 305].

Shortly after the Court entered the first group of judgments, Sudan at long last arrived on the scene (or, in the case of <u>Owens</u>, returned). On April 28, 2014, new counsel for Sudan entered appearances in <u>Owens</u>, <u>Mwila</u>, and <u>Khaliq</u>, and filed a notice of appeal in each. Sudan did not, however, take any immediate action in the four other cases, in which final judgments had not yet been entered. Only several weeks <u>after</u> judgment was subsequently entered in those cases did Sudan appear, again filing notices of appeal. Similarly, despite reappearing in <u>Owens</u> in April 2014, Sudan took no action with respect to the Aliganga plaintiffs until after judgment was entered in their favor in October 2014.

In April 2015 Sudan retained new counsel and, over the course of several weeks, filed the eight motions to vacate that are presently before the Court. Soon after, Sudan filed its opening brief in the consolidated appeal of these cases before the D.C. Circuit. Br. for Appellants, <u>Owens v. Islamic Republic of Iran</u>, No. 14-5105 (D.C. Cir. May 11, 2015) ("Sudan's D.C. Cir. Br."). Before any of the plaintiffs filed their appellees' briefs, however, the D.C. Circuit granted their request to stay the appeal pending this Court's consideration of the motions to vacate. Order, <u>Owens v. Islamic Republic of Iran</u>, No. 14-5105 (D.C. Cir. July 22, 2015). After all filings related to the motions were received, the Court held a consolidated motions hearing on December 18, 2015. <u>See generally</u> Mot. Hr'g Tr. [<u>Owens</u> ECF No. 399]. Mindful that these cases might impact foreign relations, the Court also invited the United States to file a statement of interest concerning any of the issues raised by Sudan's motions, but the United States declined to file such a statement. Notice by the United States [<u>Owens</u> ECF No. 396].

## <u>DISCUSSION</u>

Sudan moves to vacate the eight judgments in these cases pursuant to Federal Rule of Civil Procedure 60(b). As relevant to these motions, Rule 60(b) provides:

> On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
>
> (1) mistake, inadvertence, surprise, or excusable neglect; . . .
>
> (4) the judgment is void; . . . or
>
> (6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b). Sudan fits—or tries to fit—a host of arguments into these three categories. Some of its arguments apply to all of these cases, others to only a subset. Some, if correct, would require the outright dismissal of some or even all of these cases. Others would lead to the dismissal of only certain plaintiffs' claims. And still others would merely give Sudan another chance to dispute its liability. Unconvinced there is one "correct" order in which to address Sudan's various arguments, the Court will proceed as follows. It will first address Sudan's argument under Rule 60(b)(1) that the failure to contest these cases before final judgment was the result of excusable neglect. It will then turn to Sudan's several arguments under Rule 60(b)(4) that these judgments, in whole or in part, are void for lack of subject-matter jurisdiction. Finally, it will address Sudan's claims of nonjurisdictional error, which Sudan lodges under Rule 60(b)(6).

### RULE 60(b)(1): SUDAN HAS FAILED TO DEMONSTRATE EXCUSABLE NEGLECT

Sudan moves to vacate all of the judgments, except those in Mwila and Khaliq, on the basis of Rule 60(b)(1), which permits relief from a final judgment based on "mistake, inadvertence, surprise, or excusable neglect." Sudan does not raise this argument in Mwila and Khaliq because relief under Rule 60(b)(1) must be sought not later than a year after the entry of judgment, see Fed. R. Civ. P. 60(c)(1), a deadline Sudan missed in those two cases. In the other cases, however, Sudan says relief under Rule 60(b)(1) is appropriate because its failure to participate in this litigation until after the entry of judgment was the product of "excusable neglect." See, e.g., Mem. Supp. Mot. to Vacate [Owens ECF No. 367-1] ("Sudan's Aliganga Mem.") at 32–36.

"'[E]xcusable neglect' is understood to encompass situations in which the failure to comply with a filing deadline is attributable to negligence." <u>Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship</u>, 507 U.S. 380, 394 (1993). "[T]he determination of excusable neglect is an equitable matter" that depends on "several relevant factors: the risk of prejudice to the non-movant, the length of delay, the reason for the delay, including whether it was in control of the movant, and whether the movant acted in good faith." <u>FG Hemisphere Assocs., LLC v. Democratic Republic of Congo</u>, 447 F.3d 835, 838 (D.C. Cir. 2006) (citing <u>Pioneer</u>, 507 U.S. at 395–397). "[A] party seeking relief on grounds of excusable neglect" must also "assert a potentially meritorious defense." <u>Id.</u> at 842. The burden of proving the right to relief under Rule 60(b)(1) rests on the movant seeking vacatur. <u>See</u> <u>Gates v. Syrian Arab Republic</u>, 646 F.3d 1, 5 (D.C. Cir. 2011).

On the facts of these cases, shouldering that burden is a Herculean task. Consider first the length of the delay. Even if one looks only at the most recently filed of these cases, <u>Opati</u>, Sudan did not enter an appearance until more than seventeen months after the complaint and summons had been served through diplomatic channels. <u>See</u> Letter from William P. Fritzlen [<u>Opati</u> ECF No. 36] (service effected on March 11, 2013); Notice of Appearance [<u>Opati</u> ECF No. 49] (appearance by Asim A. Ghafoor on August 21, 2014). But given the close relationship among these cases, it is far too generous to Sudan to measure the length of delay with reference to <u>Opati</u>. A much fairer starting point would be the date of Sudan's second default in <u>Owens</u>, which the Clerk entered on March 25, 2010. Clerk's Entry of Default [<u>Owens</u> ECF No. 173]. (And even that is likely too generous, for in practice Sudan had stopped being a responsible litigant in <u>Owens</u> years before.) Taking March 25, 2010, as the starting point, Sudan was absent from this litigation for just over <u>four years</u>, and it was only after nearly <u>five years</u> that Sudan filed the first of these

motions to vacate.  This is an extraordinary amount of delay.  Sudan has not pointed to a single case in which a delay of this magnitude was found excusable.

Of course, turning to the next factor, a delay of this length could be consistent with excusable neglect if the reasons for the delay were sufficiently compelling.  The lack of actual knowledge of a lawsuit or filing deadline can be a compelling reason, see 11 Charles Alan Wright et al., Federal Practice and Procedure § 2858, at 333–37 (3d ed. 2012), but Sudan has made no such claim.  Nor could it.  Sudan was obviously aware of Owens—after its initial default, it actively participated in that case before defaulting a second time.  Although Sudan did not participate in any of the other six cases until after the entry of final judgment, it was served with the complaint in each, as well as with the Court's 2011 liability opinion.  And as Sudan's counsel conceded, "there's no dispute about service being proper."  Mot. Hr'g Tr. at 11:20.  Thus, Sudan was well aware of these cases and yet did nothing.

Rather than lack of knowledge, Sudan offers two other reasons for its delay, both of which are contained in a declaration from Sudan's ambassador to the United States.  Sudan first points to its troubled domestic situation, noting that its absence from this litigation

> was principally during periods of well-known civil unrest and political turmoil in Sudan, in addition to times of natural disaster wrought by heavy flooding . . . .  The cession of south Sudan and the attendant and protracted diplomatic moves and negotiations completely pre-occupied the Government of Sudan and necessitated the diversion of all meager legal and diplomatic personnel to that process.

Khalid Decl. [Owens ECF No. 367-2] ¶ 4.  Sudan also claims an ignorance of American law, citing "a fundamental lack of understanding in Sudan about the litigation process in the United States, in particular surrounding the limits of foreign sovereign immunity and developments in that area of the law."  Id. ¶ 5.

The Court finds neither of these proffered justifications particularly persuasive.  As for the first, the Court will not deny that Sudan has experienced serious turmoil over the past decade.  Some of that turmoil, however, has been of the Sudanese government's own making.  See, e.g., Darfur Peace and Accountability Act of 2006, Pub. L. No. 109-344, § 4(1), 120 Stat. 1869, 1873 (expressing Congress's sense that "the genocide unfolding in the Darfur region of Sudan is . . . [occurring] with the complicity and support of the National Congress Party-led faction of the Government of Sudan"); Sudan Accountability and Divestment Act of 2007, Pub. L. No. 110-174, §§ 7–8, 121 Stat. 2516, 2522 (expressing Congress's sense that "the Government of Sudan . . . continue[s] to oppress and commit genocide against people in the Darfur region and other regions of Sudan" and "refus[es] to allow the implementation of a peacekeeping force in Sudan").[2]  But even setting the question of blame aside, the Court does not find this an adequate reason.  Domestic turmoil would surely have justified requests by Sudan for extensions of time in which to respond to the plaintiffs' filings.  It would have also probably led the Court to forgive late filings.  And perhaps it would have even justified a blanket stay of these cases.  But Sudan was not merely a haphazard, inconsistent, or sluggish litigant during the years in question—it was a complete and utter non-litigant.  Sudan never sought additional time or to pause any of these cases in light of troubles at home.  Sudan never even advised the Court of those troubles at the time they were allegedly preventing Sudan's participation—not through formal filings, and not through any letters or other mode of communication with the Court.  The idea that the relevant Sudanese officials could not find the opportunity over a period of years to send so much as a single letter or email

---

[2] See also President Bush's Statement on Signing the Sudan Accountability and Divestment Act of 2007, 43 Weekly Comp. Pres. Doc. 1646 (Dec. 31, 2007) ("I share the deep concern of the Congress over the continued violence in Darfur perpetrated by the Government of Sudan and rebel groups.").

communicating Sudan's desire but inability to participate in these cases is, quite literally, incredible. Sudan's single, vague paragraph of explanation simply does not convince the Court.

In relying on its domestic troubles, Sudan attempts to liken these cases to <u>FG Hemisphere Associates</u>, in which the D.C. Circuit held that the district court abused its discretion by denying Rule 60(b)(1) relief to the Democratic Republic of Congo (DRC). <u>See</u> 447 F.3d at 839–43. But the factual gulf between that case and these is unbridgeably wide. In <u>FG Hemisphere Associates</u>, the DRC was a mere two months late in responding to a motion to execute, some of which delay was attributable to the movant's failure to translate the motion. <u>Id.</u> at 839–41. True, the D.C. Circuit relied in part on the fact that the DRC "was plainly hampered by its devastating civil war," <u>id.</u> at 841, but that hardly suggests that Sudan's domestic upheaval is a sufficient justification here. Despite its devastating civil war, "the DRC secured counsel only one day after receiving its first actual notice, filing its motion to quash less than four weeks later." <u>Id.</u> at 840. Sudan, by contrast, did absolutely <u>nothing</u> for <u>years</u>, while plainly aware of the litigation. The DRC's relatively minor lateness, rectified by prompt efforts to respond, is a world apart from Sudan's years of knowing inaction.

Nor is the Court persuaded by Sudan's alleged lack of understanding of U.S. litigation. As a general matter, it is true, courts should be mindful that foreign sovereigns might not be familiar with our judicial system or might misconceive the scope of their immunity. <u>See Practical Concepts, Inc. v. Republic of Bolivia</u>, 811 F.2d 1543, 1551 n.19 (D.C. Cir. 1987). <u>But see</u> 11 Wright et al., <u>supra</u>, § 2858, at 352–55 & n.26 (noting that "ignorance of the law" is generally not grounds for Rule 60(b)(1) relief). Indeed, it was in part for this reason that the Court vacated Sudan's <u>first</u> default in <u>Owens</u>. <u>See Owens I</u>, 374 F. Supp. 2d at 8–10. But the fundamental-ignorance card cannot convincingly be played a second time, especially not after hiring

sophisticated U.S. legal counsel, as Sudan did in 2004.  Sudan's more specific claim that it was ignorant of "the limits of foreign sovereign immunity and developments in that area of the law," Khalid Decl. ¶ 5, is hard to understand.  The claim would make sense if an early decision in <u>Owens</u> had indicated that Sudan <u>was</u> immune, but then a later development that Sudan was conceivably unaware of, such as the 2008 FSIA amendments, had undermined that immunity.  But that is not what happened.   Although the <u>Owens I</u> decision identified deficiencies in the plaintiffs' allegations, it clearly indicated that Sudan might <u>not</u> be immune.  <u>See, e.g.</u>, 374 F. Supp. 2d at 17 ("[I]t cannot be said at this early stage of the proceedings that plaintiffs will be unable to show that the Sudan defendants provided material support to al Qaeda within the meaning of the [FSIA] and that this support was a proximate cause of the embassy bombings.").  By rejecting Sudan's FSIA-based arguments for dismissal, this Court in <u>Owens II</u> and the D.C. Circuit in <u>Owens III</u> put Sudan on even clearer notice that it might not be immune.  And this Court's 2011 decision in <u>Owens IV</u> renders Sudan's claim of ignorance wholly untenable.  That decision, issued <u>after</u> the 2008 FSIA amendments, definitively concluded that Sudan was not immune and was liable in connection with the embassy bombings.  That decision, moreover, was translated into Arabic and delivered to Sudan through diplomatic channels on September 11, 2012.  <u>See</u> Letter from William P. Fritzlen [<u>Owens</u> ECF No. 282].  If an honestly held but mistaken conception of its immunity had truly been the reason Sudan was not participating in these cases, <u>Owens IV</u> should have spurred it to action.  Instead, Sudan did nothing for more than 19 months.

In light of the foregoing, the Court is by no means persuaded that Sudan has behaved in good faith.  That is, the Court is not convinced that Sudan would have participated in the prejudgment proceedings if only circumstances had been more favorable.  Viewing the entire history of the litigation, it seems more likely that Sudan chose (for whatever reason) to ignore these

cases over the years, changing course only when the final judgments saddled it with massive liability.  A defendant who disputes a federal court's jurisdiction is free to take this approach, letting a default judgment be entered and raising his objection only in subsequent proceedings.  See Practical Concepts, 811 F.2d at 1547.  But he must accept the consequences of that choice: "If he loses on the jurisdictional issue . . . his day in court is normally over; as a consequence of deferring the jurisdictional challenge, he ordinarily forfeits his right to defend on the merits."  Id.  To be clear, the Court is not calling into question the current good faith of the Sudanese officials who have now decided to defend these cases.  But the question is not whether Sudan now wishes to participate fully—or now wishes it had done so all along—but rather whether it was acting in good faith during the years of inaction.  Given how long-lasting and complete that inaction was, and how weak Sudan's proffered explanations are, the Court cannot conclude that Sudan acted in good faith.

Turning to the final factor, vacatur would pose a real risk of prejudice to the plaintiffs, Sudan's blithe assertion to the contrary notwithstanding.  There is, to start, the time and money the plaintiffs have spent litigating these cases in Sudan's absence, much of which will have been wasted if Sudan now gets a mulligan.  For example, much of the plaintiffs' efforts preparing for and conducting the 2010 liability hearing will have been for naught—a serious waste that could have been avoided by Sudan's timely participation.  Sudan's suggestion that the hearing will not have been wasted because it also addressed Iran's misconduct, and the default judgment against Iran will remain, is unpersuasive.  Throwing half a ripe apple in the garbage may be less wasteful than tossing the whole thing, but wasteful it remains.  More troubling than the pointless loss of the plaintiffs' resources, however, is the fact that the delay would surely make it harder for them to prove their case going forward.  "[L]itigation is better conducted when the dispute is fresh and

additional facts may, if necessary, be taken without a substantial risk that witnesses will die or memories fade." <u>Sibron v. New York</u>, 392 U.S. 40, 57 (1968); <u>see also</u> <u>Wilson v. Garcia</u>, 471 U.S. 261, 271 (1985) ("Just determinations of fact cannot be made when, because of the passage of time, the memories of witnesses have faded or evidence is lost."). The years of delay spawned by Sudan's nonparticipation presents a serious likelihood of lost witnesses, memories, and documentary evidence, to the detriment of the plaintiffs, who bear the burden of proof on the merits. Finally, a number of plaintiffs have in fact died during the course of this litigation, and others might die during the years it would take to relitigate these cases. <u>See</u> Ndeda Aff. [<u>Amduso</u> ECF No. 288-14]. Hence, there is sufficient danger of prejudice that this factor, like the others, weighs against Sudan.

In sum, Sudan has failed to carry its burden of showing that its failure to participate was the result of excusable neglect. The Court doubts that Sudan's nonparticipation was a matter of neglect at all—as opposed to a matter of choice, whether well-considered or reckless. But if indeed neglect, then that neglect—so complete and so enduring—was inexcusable. (Accordingly, the Court need not address whether Sudan has "assert[ed] a potentially meritorious defense." <u>FG Hemisphere Assocs.</u>, 447 F.3d at 842.) Insofar as they rely on Rule 60(b)(1), therefore, Sudan's motions to vacate the judgments are denied.

Equally unavailing is Sudan's argument that its years of domestic turmoil justify vacating the judgments under Rule 60(b)(6), which permits vacatur for "any other reason that justifies relief." Sudan makes this argument most clearly in <u>Mwila</u> and <u>Khaliq</u>, <u>see, e.g.</u>, Mem. Supp. Mot. to Vacate [<u>Mwila</u> ECF No. 121-1] ("Sudan's <u>Mwila</u> Mem.") at 13–15, though it makes a perfunctory version in the other cases as well, <u>see, e.g.</u>, Sudan's Aliganga Mem. at 35–36. The Court is hard pressed to see how this argument is anything but a rehash of Sudan's Rule 60(b)(1)

argument for excusable neglect.  With respect to <u>Mwila</u> and <u>Khaliq</u>, therefore, it is not only unpersuasive but time-barred—for Rule 60(b)'s "provisions are mutually exclusive, and thus a party who failed to take timely action due to 'excusable neglect' may not seek relief more than a year after the judgment by resorting to subsection (6)." <u>Pioneer</u>, 507 U.S. at 393.

Moreover, Sudan points to no precedent for Rule 60(b)(6) relief under circumstances like these.  Sudan's primary reliance on <u>Ungar v. Palestine Liberation Organization</u>, 599 F.3d 79 (1st Cir. 2010), is puzzling.  The defendants in that case, forsaking any argument for excusable neglect, "freely admit[ted] that the default judgment resulted from their deliberate strategic choice," but "insist[ed] that they [had] had a good-faith change of heart" and wished to present their defenses, circumstances they thought justified relief under Rule 60(b)(6).  599 F.3d at 85–86.  Sudan has made no admission of a deliberate choice, and doing so would flatly contradict its primary claim of excusable neglect, as <u>Ungar</u> itself teaches.  <u>See id.</u> at 85 ("willfulness . . . is directly antagonistic to a claim premised on any of the grounds specified in [Rule 60(b)(1)]").  What does Sudan mean, then, when it says that it too has had a "good-faith change of heart"?  Sudan's <u>Mwila</u> Mem. at 13 (quoting <u>Ungar</u>, 599 F.3d at 86).  Isn't Sudan's position that its heart has been in the right place all along, just not its resources?  In any event, even if Sudan's Rule 60(b)(6) argument could be fit into <u>Ungar</u>'s mold without contradicting Sudan's claim of excusable neglect, the court in <u>Ungar</u> did not—contrary to Sudan's misreading of the case—"vacat[e the] default judgment under Rule 60(b)(6)."  Sudan's Aliganga Mem. at 36.  The First Circuit held in <u>Ungar</u> that the denial of the defendants' Rule 60(b)(6) motion had rested on an erroneous categorical rule, but it did not say that the motion should have been granted.  599 F.3d at 87 & n.6.

Here, the Court does not rely on the categorical rule disapproved in <u>Ungar</u>.  It instead rejects Sudan's Rule 60(b)(6) argument because, first, it appears simply to reiterate Sudan's (already

rejected) Rule 60(b)(1) argument.  And to the extent it can be construed as a distinct argument, it is simply unconvincing and unsupported by factually apposite precedent.  Relief under Rule 60(b)(6) requires the existence of "extraordinary circumstances."  Gonzalez v. Crosby, 545 U.S. 524, 536 (2005).  "In a vast majority of the cases finding that extraordinary circumstances do exist so as to justify relief, the movant is completely without fault for his or her predicament; that is, the movant was almost unable to have taken any steps that would have resulted in preventing the judgment from which relief is sought."  12 James Wm. Moore et al., Moore's Federal Practice § 60.48[3][b] (3d ed. 2015).  For the reasons already discussed, Sudan cannot possibly be deemed "completely without fault"—not for its own domestic turmoil, and certainly not for its predicament in this litigation.

### RULE 60(b)(4): THE BOMBINGS WERE ACTS OF EXTRAJUDICIAL KILLING

Although Rule 60(b) speaks of grounds on which a court "may" grant relief from a final judgment, relief from a void judgment under Rule 60(b)(4) is not discretionary.  Bell Helicopter Textron, Inc. v. Islamic Republic of Iran, 734 F.3d 1175, 1179 (D.C. Cir. 2013).  "Under [Rule 60(b)(4)], the only question for the court is whether the judgment is void; if it is, relief from it should be granted."  Austin v. Smith, 312 F.2d 337, 343 (D.C. Cir. 1962).  In this circuit, a judgment is void within the meaning of Rule 60(b)(4) "whenever the issuing court lacked [subject-matter] jurisdiction."  Bell Helicopter, 734 F.3d at 1180.[3]  And because under the FSIA subject-matter jurisdiction exists where immunity is absent, and is absent where immunity exists, Sudan can raise a range of arguments concerning its sovereign immunity under Rule 60(b)(4).

---

[3] Other circuits, by contrast, hold "that a lack of subject matter jurisdiction will not always render a final judgment 'void.'  Only when the jurisdictional error is 'egregious' will courts treat the judgment as void" under Rule 60(b)(4).  United States v. Tittjung, 235 F.3d 330, 335 (7th Cir. 2000); see also United Student Aid Funds, Inc. v. Espinosa, 559 U.S. 260, 271 (2010) ("Federal courts considering Rule 60(b)(4) motions that assert a judgment is void because of a jurisdictional defect generally have reserved relief only for the exceptional case in which the court that rendered judgment lacked even an 'arguable basis' for jurisdiction.").

The first and most expansive of these jurisdictional arguments is that the embassy bombings were not acts of "extrajudicial killing" within the meaning of the FSIA.  Section 1605A provides, in relevant part, that a foreign state is not immune from a suit

> in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, <u>extrajudicial killing</u>, aircraft sabotage, hostage taking, <u>or the provision of material support or resources for such an act</u> if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1) (emphasis added).  The plaintiffs' theory of jurisdiction has always been that the bombings were acts of extrajudicial killing for which Sudan provided material support or resources.  Sudan of course denies that it provided such support, but it now also denies that the bombings qualify as extrajudicial killings.  And if that contention were correct, § 1605A would not eliminate Sudan's immunity even if Sudan had provided vital support to al Qaeda's attacks, or even if it had carried out the bombings directly.  If the bombings were not acts of extrajudicial killing, then, all eight judgments must be vacated in full and all of these cases dismissed.  The Court concludes, however, consistent with all the FSIA precedent it has found, that the bombings qualify as acts of extrajudicial killing within the meaning of the statute.

"Extrajudicial killing" is a defined term in the FSIA.  For purposes of § 1605A, "the terms 'torture' and 'extrajudicial killing' have the meaning given those terms in section 3 of the Torture Victim Protection Act of 1991" (TVPA).  28 U.S.C. § 1605A(h)(7).[4]  Section 3 of the TVPA in turn specifies that

> the term "extrajudicial killing" means a deliberate killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable

---

[4] The same definition of "extrajudicial killing" existed under the now repealed § 1605(a)(7).  <u>See</u> 28 U.S.C. § 1605(e)(1) (2006).

> by civilized peoples.  Such term, however, does not include any such killing
> that, under international law, is lawfully carried out under the authority of a
> foreign nation.

Pub. L. No. 102-256, § 3(a), 106 Stat. 73, 73 (codified at 28 U.S.C. § 1350 note).  On its face, this

definition encompasses the embassy bombings.  First and most obviously, the bombings were

"killing[s]."  They were also "deliberated": it is clear from the careful timing and magnitude of the

bombings that the killers planned their actions carefully and intended those actions to result in

death.  See, e.g., Mamani v. Berzain, 654 F.3d 1148, 1155 (11th Cir. 2011) (deliberated killing is

one "undertaken with studied consideration and purpose").  The killings were plainly not

authorized by the judgment of any court.  And, finally, there is no suggestion that these killings

were permissible under international law.  Numerous district court decisions in this circuit have

followed this basic reasoning to conclude that similar terrorist bombings were extrajudicial killings

under the FSIA.  See, e.g., Ben-Rafael v. Islamic Republic of Iran, 540 F. Supp. 2d 39, 53 (D.D.C.

2008); Blais v. Islamic Republic of Iran, 459 F. Supp. 2d 40, 53 (D.D.C. 2006); Salazar v. Islamic

Republic of Iran, 370 F. Supp. 2d 105, 113 (D.D.C. 2005).

In Sudan's view, however, these decisions are all mistaken.  For, according to Sudan, there

is more to the term "extrajudicial killing" than the statutory definition in the TVPA.  Specifically,

"[t]he language and context of the definition of 'extrajudicial killing' in the TVPA indicates that

Congress intended to adopt the international law meaning of that term."  Sudan's D.C. Cir. Br. at

19.  And that "international law meaning," Sudan continues, does not encompass bombings like

these for two reasons: it covers only killings by state actors, and it does not include "broad-based

terrorist attack[s]."  Id. at 16, 22; see also Consolidated Reply Mem. [Owens ECF No. 378]

("Reply") at 5 (" 'extrajudicial killing' does not encompass terrorist bombings").

The Court parts ways with Sudan at the first step.  Section 3 of the TVPA defines

"extrajudicial killing" the way it defines "extrajudicial killing."  It does not secretly adopt by

reference some different definition that is broader or narrower than the definition in its text. "Statutes are law, not evidence of law," much less evidence of meaningfully <u>different</u> law.  <u>Matter of Sinclair</u>, 870 F.2d 1340, 1343 (7th Cir. 1989).  (And it is hard to see why Sudan spends pages and pages establishing its "international law meaning" premise unless it thinks that meaning is advantageously different from the statutory definition.)  It may be, as some legislative history suggests, that the drafters of the TVPA believed that their statutory definition was consistent with the international law understanding of the term "extrajudicial killing."  <u>See</u> S. Rep. No. 102-249, at 6 (1991); H.R. Rep. No. 102-367, at 4 (1991).  But that justifies, at most, turning to international law to help clarify any ambiguous terms in the statutory definition—not turning to international law <u>instead of</u> the statutory definition.  If, for instance, international law did not in fact always require extrajudicial killings to be "deliberated," it would nonetheless be the case that only "deliberated" killings are actionable under the TVPA and § 1605A of the FSIA.  "When a statute includes an explicit definition, [courts] must follow that definition, even if it varies from that term's ordinary meaning," <u>Stenberg v. Carhart</u>, 530 U.S. 914, 942 (2000), or its meaning in another legal context, <u>see, e.g.</u>, <u>Burgess v. United States</u>, 553 U.S. 124, 129–30 (2008).

The fact that the second sentence of the definition excludes killings that are lawful "under international law" does not alter this conclusion.  Indeed, it shows that when Congress wants to incorporate international law directly into U.S. law, without further distillation or qualification, it says so.  The FSIA itself provides another example, eliminating foreign sovereign immunity in certain cases where "rights in property taken in violation of international law are in issue."  28 U.S.C. § 1605(a)(3).  Thus, the way the TVPA (or the FSIA) would indicate that "extrajudicial killing" means whatever it means in international law is by saying precisely that.  <u>Cf.</u> 18 U.S.C. § 1651 (punishing with life imprisonment "the crime of piracy as defined by the law of nations");

18 U.S.C. § 2339C(e)(14) ("the term 'state' has the same meaning as that term has under international law").

Hence, whatever the international law definition of "extrajudicial killing," there is no requirement under the FSIA that the killers be state actors.[5] Section 1605A of the FSIA says that "extrajudicial killing" has the meaning given in section 3 of the TVPA, and section 3 of the TVPA is devoid of any state-actor requirement.  It would be no more appropriate for the Court to add a new requirement to the definition than to delete an existing one.  Jama v. Immigration & Customs Enf't, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply . . . .");  62 Cases, More or Less, Each Containing Six Jars of Jam v. United States, 340 U.S. 593, 596 (1951) ("Congress expresses its purpose by words.  It is for us to ascertain—neither to add nor to subtract, neither to delete nor to distort.").  It is true that liability under the TVPA itself is limited to those who act "under actual or apparent authority, or color of law, of any foreign nation," but that limitation is not part of the definition of "extrajudicial killing" in section 3, but is rather part of the cause of action in section 2.  TVPA section 2(a), 28 U.S.C. § 1350 note.  Had Congress wished to limit extrajudicial killings under the FSIA to those perpetrated directly by state actors, it could have cross-referenced both TVPA sections.  But it did not.  First in 1996, and again in 2008, Congress incorporated only TVPA section 3.  See 28 U.S.C. § 1605A(h)(7) (enacted 2008); 28 U.S.C. § 1605(e)(1) (enacted

---

[5] Sudan has not even made a compelling case that the international law definition demands state actors.  For instance, Sudan points to the definition of "extrajudicial killing" found in the U.N. Terminology Database.  See Sudan's D.C. Cir. Br. at 18.  But that definition does not include a state-actor requirement, and in fact encompasses "[k]illings committed . . . by vigilante groups."  U.N. Terminology Database, http://untermportal.un.org/UNTERM/ display/Record/UNHQ/extra-legal_execution/c253667 (last visited Mar. 23, 2016).  Sudan also discusses the work of the U.N. Special Rapporteur on Summary or Arbitrary Executions.  See Sudan's D.C. Cir. Br. at 16–18.  The Special Rapporteur has not reported only on killings by state actors.  Indeed, the Special Rapporteur from 2004 to 2010 has compiled an online "Handbook" that contains an entire chapter on "Killings by non-state actors and affirmative State obligations."  Project on Extrajudicial Executions, UN Special Rapporteur on Extrajudicial Executions Handbook, http://www.extrajudicialexecutions.org/LegalObservations.html (last visited Mar. 23, 2016).

1996, repealed 2008); cf. Sudan's D.C. Cir. Br. at 50 ("Where Congress knows how to say something but chooses not to, its silence is controlling." (internal quotation marks omitted)).

The absence of a state-actor requirement is also consistent with § 1605A's removal of immunity not only when a defendant state is responsible for an extrajudicial killing, but also when it is responsible for "the provision of material support or resources for such an act." 28 U.S.C. § 1605A(a)(1). Congress clearly wanted to permit liability both when states themselves perpetrate the predicate acts and also when they help others do so. And the most obvious actors that Congress would worry might receive material support from designated state sponsors of terrorism (which are the only states covered by § 1605A) are non-state terrorist organizations. The Court does not mean to say that Sudan's interpretation would actually render statutory text meaningless. But it is more consonant with the overall thrust of § 1605A—namely, to render designated state sponsors of terrorism liable for directly perpetrating or materially supporting the predicate acts—not to import an extra-textual state-actor requirement into the definition of "extrajudicial killing."

What of Sudan's contention that, even apart from the state-actor issue, a terrorist bombing just cannot be an extrajudicial killing? Even if the Court accepted Sudan's "international law meaning" premise, Sudan has not provided an authoritative international law definition of "extrajudicial killing" that clearly excludes these bombings. Sudan says that under international law "extrajudicial killing" means "summary execution," Sudan's D.C. Cir. Br. at 19, but offering a synonym does not advance the analysis. Sudan's papers nowhere identify exactly what it is that puts the bombings outside the scope of either term. At the motions hearing, Sudan's counsel had to concede (what seems obvious to the Court) that it cannot be the mere fact that the weapon used was a bomb. Mot. Hr'g Tr. at 32:10–11. Counsel also conceded (what again seems obvious) that it cannot be the mere fact of multiple victims. Id. at 32:15–17. The bottom-line objection seemed

to be that a bombing of this sort "is indiscriminate in its killing of individuals." Id. at 32:21–24; see also id. at 35:11–14 (contending that "[e]xtrajudicial killing" and "[i]ndiscriminate terrorism bombing" are "at opposite ends of [a] spectrum").[6] Put otherwise, and with far more precision than Sudan has provided, the alleged problem is that the bombers did not know whom exactly they would kill and could not be certain that any specific individual would die.

The Court is unconvinced, however, that this characteristic precludes an act of killing from being an act of "extrajudicial killing" within the meaning of § 1605A. The statutory definition does not contain a precision-targeting element. Sudan's counsel suggested for the first time at the motions hearing that this notion inheres in the word "deliberated." Mot. Hr'g Tr. at 33:13–15; see TVPA section 3(a), 28 U.S.C. § 1350 note ("[T]he term 'extrajudicial killing' means a deliberated killing . . . ."). The Court disagrees. A "deliberated" killing is simply one undertaken with careful consideration, not on a sudden impulse. See, e.g., Webster's Third New International Dictionary 596 (1993) ("deliberate": "to ponder or think about with measured careful consideration and often with formal discussion before reaching a decision or conclusion"); 4 The Oxford English Dictionary 414 (2d ed. 1989) ("deliberated": "Carefully weighed in the mind"); Black's Law Dictionary 492 (9th ed. 2009) ("deliberation": "The act of carefully considering issues and options before making a decision or taking some action"); see also, e.g., State v. Hamlet, 321 S.E.2d 837, 842–43 (N.C. 1984) ("Deliberation means an intent to kill carried out by the defendant in a cool state of blood, in furtherance of a fixed design for revenge or to accomplish an unlawful purpose and not under the influence of a violent passion, suddenly aroused by lawful or just cause or legal provocation."); People v. Dykhouse, 345 N.W.2d 150, 154 (Mich. 1984) ("Deliberate means that the defendant must have considered the pros and cons of that design and have measured and chosen

---

[6] Readers are invited to try to find a clear enunciation of this point anywhere in Sudan's filings.

his actions.  The intent must be formed by a mind that is free from undue excitement.  This excludes acts done on a sudden impulse without reflection." (quoting jury instructions with approval)).  The killings here were obviously the product of deliberation.  No one can seriously doubt that the bombers carefully planned their attack with the goal and expectation of killing those in and around the embassies.  No, they did not look their victims in the eye, nor could they have produced a list of names of those who would perish, but their killings were nonetheless deliberated.

In addition to its unpersuasive argument about what § 1605A <u>does</u> say, Sudan makes an argument about what it does not.  These bombings do not come within § 1605A, the argument goes, because § 1605A "does not include 'terrorism' as a predicate act."  Sudan's D.C. Cir. Br. at 26.  Sudan explains that in the early 1990s Congress considered adding a broad "international terrorism" exception to the FSIA but decided against it, instead confining the new immunity exception to the four predicate acts of torture, extrajudicial killing, hostage taking, and aircraft sabotage.  <u>See</u> <u>id.</u> at 22–25 (citing S. 825, 103d Cong. (1993)).  To read "extrajudicial killing" as encompassing terrorist bombings, Sudan argues, would effectively nullify Congress's decision <u>not</u> to enact the broader statute.  Mot. Hr'g Tr. at 36:12–21.  Moreover, says Sudan, there <u>is</u> a federal statute that creates a cause of action for victims of terrorism: the Anti-Terrorism Act (ATA), 18 U.S.C. § 2331 <u>et seq.</u>  That act was even amended in 2002 to specifically cover bombings, including bombings of U.S. embassies and consulates.  <u>See</u> 18 U.S.C. § 2332f(b)(2)(E).  The ATA illustrates how Congress creates liability for terrorist bombings, Sudan argues, but it specifically excludes foreign states from liability.  <u>See</u> <u>id.</u> § 2337.  According to Sudan, the logical inference to be drawn is that Congress does not intend the FSIA to permit liability for terrorist bombings like these.  Sudan's D.C. Cir. Br. at 26–29.

As to the basic point, the Court cannot disagree with Sudan: § 1605A does not contain an immunity exception for acts of "terrorism."   Nor did its predecessor, § 1605(a)(7).   A plaintiff trying to sue under § 1605A on the theory that a foreign state's conduct amounted to "terrorism" is out of luck.  But Sudan's conclusion does not follow.  That § 1605A does not include "terrorism" does not mean that it excludes everything that could be called (or meet some legal definition of) "terrorism."   For the past fifteen years it has been hard to think of a more quintessential act of terrorism than the purposeful destruction of a passenger aircraft in flight—yet such an act is manifestly covered by § 1605A.  That it is "terrorism" is irrelevant; all that matters is that it is "aircraft sabotage" within the meaning of § 1605A.  See 28 U.S.C. § 1605A(h)(1) (incorporating Article 1 of the Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation).  The same logic applies to any act that a plaintiff claims is an extrajudicial killing under § 1605A.  If it falls within the statutory definition, it is; if it doesn't, it isn't.  For the reasons already explained, these bombings fit within the FSIA's definition of "extrajudicial killing."   That they can also be called "terrorism" does not pull them out.  To give such an immunity-expanding effect to the label "terrorism" is especially perverse when one remembers that the very reason a foreign state is even subject to the immunity exceptions in § 1605A is that the Secretary of State has determined that its government "has repeatedly provided support for acts of international terrorism"—i.e., is a state sponsor of terrorism.  28 U.S.C. § 1605A(h)(6).

Although the foregoing suffices to explain the Court's conclusion that the bombings were acts of extrajudicial killing under § 1605A, the Court's conviction is bolstered by another principle: "If a statute uses words or phrases that have already received authoritative construction by the jurisdiction's court of last resort, or even uniform construction by inferior courts or a responsible administrative agency, they are to be understood according to that construction."

Antonin Scalia & Bryan A. Garner, Reading Law 322 (2012) (emphasis added).   The FSIA exception for extrajudicial killings was first enacted in 1996, in § 1605(a)(7).   Over the next twelve years, numerous district court decisions from this circuit (where the vast majority of § 1605(a)(7) litigation occurred) held that terrorist bombings could be extrajudicial killings under the FSIA. And among the cases in which they did so were a number that involved some of the most infamous terrorist attacks of the late 20th century: the 1983 bombing of the U.S. embassy in Beirut,[7] the 1983 bombing of the U.S. Marine barracks in Beirut,[8] the 1984 bombing of the U.S. embassy annex in East Beirut,[9] the 1992 bombing of the Israeli embassy in Buenos Aires,[10] the 1996 Khobar Towers bombing,[11] and the 1998 embassy attacks at issue here.[12]   And a federal court in Virginia likewise held that victims of the 2000 bombing of the U.S.S. Cole could sue under § 1605(a)(7).[13]   True, as Sudan notes, in none of these cases did the foreign sovereign contest the meaning of "extrajudicial killing."   But that is irrelevant for present purposes.   The point is that by 2008 the unmistakable and unanimous judicial reading of § 1605(a)(7)—even if not the product of adversarial litigation— was that its use of "extrajudicial killing" encompassed terrorist bombings of this kind.

   This reading was hardly hidden from Congress.   Indeed, in 2000, Congress passed a statute that provided a compensation scheme for certain individuals who "held a final judgment for a

---

[7] Dammarell v. Islamic Republic of Iran, 281 F. Supp. 2d 105, 192 (D.D.C. 2003), vacated in part on other grounds by Dammarell v. Islamic Republic of Iran, 404 F. Supp. 2d 261 (D.D.C. 2005); Salazar v. Islamic Republic of Iran, 370 F. Supp. 2d 105, 113 (D.D.C. 2005).

[8] Peterson v. Islamic Republic of Iran, 264 F. Supp. 2d 46, 61 (D.D.C. 2003).

[9] Wagner v. Islamic Republic of Iran, 172 F. Supp. 2d 128, 133 (D.D.C. 2001)

[10] Ben-Rafael v. Islamic Republic of Iran, 540 F. Supp. 2d 39, 53 (D.D.C. 2008)

[11] Blais v. Islamic Republic of Iran, 459 F. Supp. 2d 40, 53 (D.D.C. 2006).

[12] Owens II, 412 F. Supp. 2d 99, 104–06 & nn.9–11 (D.D.C. 2006).

[13] Rux v. Republic of Sudan, 2005 WL 2086202, at *13 (E.D. Va. Aug. 26, 2005), aff'd in part, appeal dismissed in part, 461 F.3d 461 (4th Cir. 2006).   The court in Rux did not discuss the meaning of "extrajudicial killing," but because the elements of § 1605(a)(7) were jurisdictional—as the court recognized—it implicitly concluded that the bombing met the definition of the term.

claim or claims brought under section 1605(a)(7) of title 28," as well as for plaintiffs who had "filed a suit under such section 1605(a)(7) on" five specific dates.  Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, § 2002(a)(2)(A), 114 Stat. 1464, 1542. One of the cases specifically identified by filing date concerned the death of a U.S. Marine in the 1984 bombing of the U.S. embassy annex in East Beirut.  See id. (listing "July 27, 2000"); Wagner v. Islamic Republic of Iran, 172 F. Supp. 2d 128 (D.D.C. 2001) (filed July 27, 2000).  And, as the accompanying Conference Report noted, two of the covered § 1605(a)(7) cases that had already gone to final judgment involved suicide bombings of buses in Israel that had been deemed extrajudicial killings.  See H.R. Rep. No. 106-939, at 116 (2000) (Conf. Rep.) (noting the cases of Alisa Flatow and of Matthew Eisenfeld and Sara Duker).  A victim of one of those bombings was Alisa Flatow, whose death inspired the creation of the federal cause of action linked to § 1605(a)(7) (discussed earlier, see supra p. 6), which became known in courts and Congress alike as the "Flatow Amendment."  See, e.g., Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 87 (D.C. Cir. 2002); 150 Cong. Rec. 24,003 (2004) (statement of Sen. Specter); 153 Cong. Rec. 22,665 (2007) (statement of Sen. Lautenberg); see also 144 Cong. Rec. 3339 (1998) (statement of Rep. Saxton) (describing the origins of the provision).  Furthermore, press coverage, legal commentary, and government reports also made clear that § 1605(a)(7) had repeatedly been interpreted to encompass terrorist bombings.  See, e.g., Carol D. Leonnig, Damages Awarded In Beirut Bombing; Judge Says Iran Backed '83 Attack, Wash. Post, Sept. 9, 2003, at A4; Jennifer K. Elsea, Cong. Research Serv., RL31258, Suits Against Terrorist States By Victims of Terrorism 8 n.24, 13 n.42, 17 n.53, 21 n.62, 43 (2005) (discussing bombing cases).

In light of this history, the 2008 FSIA amendments take on added significance.  In those amendments, Congress deleted § 1605(a)(7) and enacted the new § 1605A, and in doing so it chose

to use the same language to define the same four predicate acts that § 1605(a)(7) had covered. That is, it used the same language that anyone who had paid the slightest attention would know had been universally read as reaching terrorist bombings. It is fair to say, then, that by choosing to reuse in § 1605A the exact terms and definitions from § 1605(a)(7), Congress implicitly ratified the courts' prior construction of "extrajudicial killing." It might be unusual for a ratification argument to rest on district court decisions, but it is not impossible. See Scalia & Garner, supra, at 325. And because FSIA terrorism cases are more likely than most to actually become known to Congress—given the notoriety of the underlying events, the magnitude of the judgments, and the potential diplomatic repercussions—this is a context in which prior construction even by district courts deserves serious weight. The history of § 1605A thus strengthens the Court's view that these bombings qualify as acts of "extrajudicial killing" within the meaning of the statute.

One final point regarding "extrajudicial killing." In some of its motions to vacate (though not in its reply or D.C. Circuit brief), Sudan makes a cryptic argument, the gist of which seems to be that plaintiffs who did not die cannot sue under § 1605A because their injuries "were not 'caused by' the 'extrajudicial killing' of others." Sudan's Aliganga Mem. at 21. Sudan also suggests it would be "absurd" for "an injured person's ability to bring a claim [to turn] on the happenstance of whether others were killed in the bombing." Id. Both parts of this argument are misguided. First, § 1605A covers "personal injury or death that was caused by an act of . . . extrajudicial killing," 28 U.S.C. § 1605A(a)(1) (emphasis added), and the same act of killing one person can quite obviously injure another. See, e.g., Death of a Terrorist, Time, Feb. 5, 1979, at 111 (noting that the car-bomb assassination of Black September leader Ali Hassan Salameh wounded 18 bystanders). And there is nothing absurd about eliminating immunity only for those acts that actually cause death, for those are likely to be the most heinous. Moreover, Sudan's

proffered "absurdity" would exist even under its own narrow view of "extrajudicial killing": the estate of an individual killed by the bullet of a state-employed assassin can sue, yet if the same individual miraculously survives, but suffers terrible injuries, he cannot. The fact that the statute draws a line that will not always appear just does not make it absurd.

In sum, the Court remains convinced that these bombings qualify as acts of "extrajudicial killing" within the meaning of § 1605A, and thus that the Court did not lack subject-matter jurisdiction for this reason.

### RULE 60(b)(4): THE PLAINTIFFS' CLAIMS WERE TIMELY FILED

Subsection (b) of § 1605A, entitled "Limitations," provides:

> An action may be brought or maintained under this section if the action is commenced, or a related action was commenced under section 1605(a)(7) (before the date of the enactment of this section) . . . not later than the latter of—
>
> **(1)** 10 years after April 24, 1996; or
> **(2)** 10 years after the date on which the cause of action arose.

28 U.S.C. § 1605A(b). Sudan contends that the Khaliq, Aliganga, and Opati plaintiffs—who filed their actions in March 2010 (Khaliq) and July 2012 (Aliganga and Opati)—did not comply with this statute of limitations because their actions were filed more than 10 years after the 1998 bombings and there is no timely "related action" they can rely on. Sudan further argues that the statute of limitations is jurisdictional, and so the untimeliness of these claims is grounds for relief under Rule 60(b)(4). The Court disagrees with Sudan on both points.

### A. Section 1605A(b) Is Not Jurisdictional

First, the Court is unpersuaded that the statute of limitations in § 1605A(b) is jurisdictional. The Supreme Court has recently reiterated that "most time bars are nonjurisdictional." United States v. Wong, 135 S. Ct. 1625, 1632 (2015) (holding statute of limitations in Federal Tort Claims Act nonjurisdictional). Indeed, courts should "treat a time bar as jurisdictional only if Congress

has clearly stated that it is." Musacchio v. United States, 136 S. Ct. 709, 717 (2016) (internal quotation marks omitted). There is no clear statement here. "Although [§ 1605A(b)] uses mandatory language, it does not expressly refer to subject-matter jurisdiction or speak in jurisdictional terms." Id. True, § 1605A(b) follows subsection (a), which does speak to subject-matter jurisdiction, but "[m]ere proximity will not turn a rule that speaks in nonjurisdictional terms into a jurisdictional hurdle." Gonzalez v. Thaler, 132 S. Ct. 641, 651 (2012). And other subsections of § 1605A, most notably subsection (c), plainly do not concern subject-matter jurisdiction, so the mere fact that the statute of limitations is located within § 1605A is not a clear statement of its jurisdictional character. Finally, there is no long history of this provision being treated as jurisdictional.[14] See Worley v. Islamic Republic of Iran, 75 F. Supp. 3d 311, 330–31 (D.D.C. 2014); cf. John R. Sand & Gravel Co. v. United States, 552 U.S. 130, 134–139 (2008) (holding statute of limitations in Tucker Act jurisdictional primarily because a "long line of earlier cases" had already so held).

In arguing otherwise, Sudan leans heavily on a statement in a D.C. Circuit opinion that § 1605A(b)'s predecessor, § 1605(f),[15] was "contain[ed]" in a "jurisdictional provision." Simon v. Republic of Iraq, 529 F.3d 1187, 1194 (D.C. Cir. 2008) ("The jurisdictional provision upon which the plaintiffs rely contains a limitation period."), rev'd on other grounds sub nom. Republic of Iraq v. Beaty, 556 U.S. 848 (2009); see Sudan's Aliganga Mem. at 5–6. But Simon did not

---

[14] Candor compels the Court to acknowledge that in a 2009 order it concluded that the limitations period in § 1605A(b) was jurisdictional. See Order of Oct. 26, 2009, Khaliq v. Republic of Sudan, No. 04-1536 [ECF No. 35] at 3. But several intervening decisions from higher courts, most notably United States v. Wong, 135 S. Ct. 1625 (2015), and Van Beneden v. Al-Sanusi, 709 F.3d 1165 (D.C. Cir. 2013), have convinced the Court to rethink its analysis.

[15] "No action shall be maintained under [§ 1605(a)(7)] unless the action is commenced not later than 10 years after the date on which the cause of action arose. All principles of equitable tolling, including the period during which the foreign state was immune from suit, shall apply in calculating this limitation period." 28 U.S.C. § 1605(f) (repealed 2008).

actually hold that § 1605(f)'s time bar was jurisdictional.  And in a more recent decision, <u>Van Beneden v. Al-Sanusi</u>, 709 F.3d 1165 (D.C. Cir. 2013), the D.C. Circuit treated § 1605A(b) as nonjurisdictional.

On appeal in <u>Van Beneden</u> was a 2010 decision in which the district court had held that an action against Libya was untimely under § 1605A(b) because an earlier suit did not qualify as a "related action."  The district court had given two independent reasons that the earlier suit was not a "related action": first, because it was not brought by the same plaintiffs, and second, because it did not stem from the same act or incident.  <u>Knowland v. Great Socialist People's Libyan Arab Jamahiriya</u>, No. 08-1309, slip op. at 6–11 (D.D.C. Oct. 8, 2010).  On appeal, however, Libya wholly failed to defend the first of these holdings.  The D.C. Circuit "[v]iew[ed] this as an implicit concession" and "d[id] not address the district court's determination that Knowland's suit fails because he was not involved in" the earlier suit against Libya.  <u>Van Beneden</u>, 709 F.3d at 1167 n.3.  It then reversed the district court's second holding and remanded the case for further proceedings.  <u>Id.</u> at 1169.  This disposition makes sense only if the D.C. Circuit concluded that timeliness under § 1605A(b) is not jurisdictional.  If it were jurisdictional, the court could not have treated the district court's first holding as conceded by Libya's silence, a point a member of the panel recognized at the oral argument.  Oral Arg. Recording at 3:05, <u>Van Beneden</u>, No. 11-7045 (D.C. Cir. Dec. 7, 2012) ("Is it something we nevertheless have to address?  Is it jurisdictional?").  That the <u>Van Beneden</u> court concluded the issue is not jurisdictional is further signaled by the opinion's citation of <u>Southern California Edison Co. v. FERC</u>, which states: "A party can and does waive any argument not presented in our court <u>except those going to our own jurisdiction or similar structural issues</u> and a concession is analogous to a waiver."  603 F.3d 996, 1000 (D.C. Cir. 2010) (emphasis added) (cited by <u>Van Beneden</u>, 709 F.3d at 1167 n.3).  Because the time limitation in

§ 1605A(b) is not jurisdictional, the alleged untimeliness of the <u>Khaliq</u>, Aliganga, and <u>Opati</u> plaintiffs' claims could not render their judgments "void" within the meaning of Rule 60(b)(4).

### B.  The Actions Were Timely

Even if § 1605A(b) <u>is</u> jurisdictional, the Court would not grant Sudan relief on this ground, for these plaintiffs' claims were timely.  As noted, for an action to be timely under § 1605A(b), either (1) the action itself must have been filed by the later of April 24, 2006, or ten years after the cause of action arose, or (2) a "related action" must have been filed by the later of those two dates. <u>See</u> 28 U.S.C. § 1605A(b).  The "related action" concept is elaborated in § 1083(c) of the 2008 NDAA (the act that created § 1605A), which provides in relevant part:

> **Related actions. —** If an action arising out of an act or incident has been timely commenced under section 1605(a)(7) of title 28, United States Code, . . . any other action arising out of the same act or incident may be brought under section 1605A of title 28, United States Code, if the action is commenced not later than the latter of 60 days after—
>
> > **(A)** the date of the entry of judgment in the original action; or
> > **(B)** the date of the enactment of this Act [Jan. 28, 2008].

Pub. L. No. 110-181, § 1083(c)(3), 122 Stat. at 343 (codified at 28 U.S.C. § 1605A note).  The <u>Khaliq</u>, Aliganga, and <u>Opati</u> actions are timely under this provision.  These actions "aris[e] out of the same act or incident" as the original <u>Owens</u> action.  <u>Owens</u> was "timely commenced under section 1605(a)(7)" in October 2001.  And the <u>Khaliq</u>, Aliganga, and <u>Opati</u> actions were "commenced not later than . . . 60 days after . . . the date of the entry of judgment in the original action," because judgment was not entered in <u>Owens</u> until 2014.

Sudan argues that these three actions are not "related" to <u>Owens</u> because a "related action" must be filed by the same plaintiffs.  <u>See</u> Sudan's Aliganga Mem. at 8–11.  In Sudan's view, § 1083(c)(3) would allow Plaintiff X, whose timely § 1605(a)(7) action went to final judgment on January 1, 2009, to file a new action under § 1605A within 60 days of that date—but  it would not

allow Plaintiff Y to file a "related" § 1605A action within that window, even if Y's action arises from the "same act or incident" as X's.  Sudan points to two cases that it thinks support this "same plaintiffs" argument.  The first is <u>Simon</u>, in which the D.C. Circuit said that "[s]ection 1083(c)(3) . . . authorizes a plaintiff who had 'timely commenced' a 'related action' under § 1605(a)(7) to bring 'any other action arising out of the same act or incident.'"  529 F.3d at 1192.  Sudan reads this sentence to mean that "the plaintiff bringing the 'related action' must be the same plaintiff who previously had timely filed a § 1605(a)(7) action."  Sudan's D.C. Cir. Br. at 54.  And the second is <u>Knowland</u>, the district court decision that squarely held that a "related action" requires the same plaintiffs, but which was then reversed on other grounds in <u>Van Beneden</u>.  <u>See</u> Sudan's Aliganga Mem. at 8–9 (relying on <u>Knowland</u>).

The Court rejects Sudan's "same plaintiffs" argument.  First and foremost, there is no such requirement in the text of § 1083(c)(3), which requires only that the actions arise from the same incident.  Nor did <u>Simon</u> require identical plaintiffs: the sentence Sudan quotes comes from a discussion of the options available to plaintiffs with "cases that were pending under [§ 1605(a)(7)] when the Congress enacted the NDAA," 529 F.3d at 1192, so it makes perfect sense that the court described how § 1083(c)(3) operates with respect to plaintiffs who had previously filed a § 1605(a)(7) action.  But <u>Simon</u> neither said nor held that <u>only</u> such plaintiffs can bring a "related action."  By contrast, the district court in <u>Knowland</u> did so hold, but this Court is not bound by that decision and, with all respect, does not find its analysis convincing.  The Court gives far greater weight to a more recent statement from the D.C. Circuit: "[T]he related action provision of § 1083(c)(3) . . . speaks of 'any <u>other</u> action,' and it turns on whether the new action 'arises from' the same act or incident, not on whether it is identical to the prior suit <u>or even brought by the same plaintiff</u>."  <u>Roeder v. Islamic Republic of Iran</u>, 646 F.3d 56, 61 (D.C. Cir. 2011) (second emphasis

added).   This statement might be dictum (as Sudan notes, <u>see</u> Reply at 18), but it is a highly persuasive dictum that accords with this Court's own reading of § 1083(c)(3).  Because there is no "same plaintiffs" requirement, the <u>Khaliq</u>, Aliganga, and <u>Opati</u> actions were "related" to <u>Owens</u> and timely filed under § 1083(c)(3).

Sudan's fallback argument is that, even if identical plaintiffs are not required, these three actions cannot be deemed "related" to <u>Owens</u> because at the time they were commenced <u>Owens</u> no longer had any § 1605(a)(7) claims pending.  Sudan's Aliganga Mem. at 11.  Sudan is correct as a descriptive matter.  Section 1083(c)<u>(2)</u> of the 2008 NDAA provided a mechanism whereby plaintiffs with pending § 1605(a)(7) actions could move to convert them into § 1605A actions. The <u>Owens</u> plaintiffs filed such a motion, which the Court granted, and they amended their complaint to allege jurisdiction under § 1605A.  <u>See</u> Pls.' Mot. [<u>Owens</u> ECF No. 131]; Order of Jan. 26, 2009 [<u>Owens</u> ECF No. 148]; Fourth Am. Compl. [<u>Owens</u> ECF No. 149].  But this fact does not have the significance Sudan wishes.  Section 1083(c)(3) does not say the original action must <u>still</u> have § 1605(a)(7) claims pending; it says the original action must "ha[ve] been timely <u>commenced</u> under section 1605(a)(7)" (emphasis added).  There is no question that <u>Owens</u> was timely commenced under § 1605(a)(7).

Although the foregoing discussion adequately explains the timeliness of these three actions, some additional discussion of <u>Khaliq</u> may be justified, given the complicated history of that case and Sudan's effort to single it out.  <u>See</u> Sudan's D.C. Cir. Br. at 55–57.  Rizwan Khaliq and Jenny Lovblom originally filed a § 1605(a)(7) action against Sudan in 2004.  <u>See</u> <u>Khaliq v. Republic of Sudan</u>, No. 04-1536 (D.D.C. filed Sept. 3, 2004).  After the passage of the 2008 NDAA, they moved under § 1083(c)(2) to convert their action into a § 1605A action.  But § 1083(c)(2) required such a conversion motion to be filed within 60 days of the NDAA's

enactment, and Khaliq and Lovblom missed that deadline; the Court accordingly denied them leave to amend their complaint.  Order of Sept. 9, 2009, Khaliq, No. 04-1536 [ECF No. 32]. Roughly six months later, Khaliq and Lovblom (now joined by seven additional co-plaintiffs) filed a new action, the Khaliq case now before the Court.  They explained that this new action was timely under § 1083(c)(3) because it was "related" to Owens (and other embassy bombing cases). See Pls.' Mem., Khaliq, No. 10-356 [ECF No. 8] at 2.

Sudan thinks this must not be allowed—that a plaintiff who missed the § 1083(c)(2) deadline should not be able to "evade [it] simply by filing an action 'related' to his (or someone else's) pending action," as this would "effectively nullif[y] § 1083(c)(2)."  Reply at 17.  But Sudan is simply incorrect that the original Khaliq plaintiffs had to proceed through § 1083(c)(2) or not at all.  As the D.C. Circuit has observed, the 2008 NDAA gave plaintiffs with pending § 1605(a)(7) actions several "options for obtaining the benefits of § 1605A," one of which was to file a new related action in accordance with § 1083(c)(3).  Bakhtiar v. Islamic Republic of Iran, 668 F.3d 773, 775 (D.C. Cir. 2012) (emphasis added).  The plaintiffs in Bakhtiar failed to exercise any of those options correctly: they neither converted their § 1605(a)(7) action within the time set by § 1083(c)(2) nor filed a new related action under § 1083(c)(3) within 60 days of the entry of judgment in their original action (which appears to have been the only case "arising from the same act or incident").  See id. at 774–75.  But the same is not true of the Khaliq plaintiffs.  True, the original Khaliq plaintiffs did not convert their action within the time set by § 1083(c)(2), but they did file a new related action not later than 60 days after the entry of judgment in another case arising from the same incident: namely, Owens, in which judgment was not entered until 2014. That they did not successfully employ § 1083(c)(2) does not bear on whether they complied with § 1083(c)(3).  Cf. Roeder, 646 F.3d at 62 (noting that "subsections [(c)(2) and (c)(3)] were added

at different times in the legislative process, serve different purposes and share little similar language").

In sum, the Court will not vacate the <u>Khaliq</u>, Aliganga, or <u>Opati</u> judgments under Rule 60(b)(4) on timeliness grounds.  The Court is unconvinced timeliness under § 1605A(b) is of jurisdictional significance.  And even if the Court is mistaken on that point, these actions were timely because they are "related" to <u>Owens</u> and brought in compliance with § 1083(c)(3) of the 2008 NDAA.

### RULE 60(b)(4): THERE WAS SUFFICIENT EVIDENCE TO SUPPORT JURISDICTION

Sudan's next attack on the judgments concerns the sufficiency of the evidence introduced at the October 2010 hearing.  It is too late for Sudan to use this argument to attack the Court's <u>merits</u> determination.  "A judgment is not void . . . simply because it is or may have been erroneous."  <u>United Student Aid Funds, Inc. v. Espinosa</u>, 559 U.S. 260, 270 (2010) (internal quotation marks omitted).  Recognizing as much, Sudan frames its evidentiary attack as going to the Court's subject-matter jurisdiction and therefore a ground to vacate under Rule 60(b)(4).  The Court will address this argument in two stages.  It will first explore whether Sudan's evidentiary objections actually pertain to subject-matter jurisdiction.  The Court concludes that Sudan's objections are irrelevant to the Court's jurisdiction to hear claims based on the federal cause of action in § 1605A(c), but that they do bear on jurisdiction to hear the foreign family members' state-law claims.  The Court then proceeds to examine whether the evidence was sufficient to support its jurisdiction over these claims, and concludes it was.

### A.  The Nature of the Jurisdictional Inquiry

In much federal litigation, the sufficiency of the evidence presented is unrelated to jurisdiction, because jurisdiction does not turn on the existence of facts.  Federal question

jurisdiction under 28 U.S.C. § 1331, most obviously, depends solely on the nature of the plaintiff's claims, not on the truth of any of his factual allegations.  See, e.g., Montana-Dakota Utils. Co. v. Nw. Pub. Serv. Co., 341 U.S. 246, 249 (1951) ("If the complaint raises a federal question, the mere claim confers power to decide that it has no merit, as well as to decide that it has.").  Thus, in a § 1331 case—for instance, a suit under the Americans with Disabilities Act—a judgment that rests on insufficient evidence is erroneous, but not void for lack of jurisdiction.  Cf. EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 623 (D.C. Cir. 1997).

The FSIA is a more complicated font of jurisdiction.  Its various exceptions to immunity rest (at least to some extent) on factual predicates, and so a foreign sovereign "defendant may challenge either the legal sufficiency or the factual underpinning of an exception."  Phoenix Consulting Inc. v. Republic of Angola, 216 F.3d 36, 40 (D.C. Cir. 2000).  Thus, for instance, in a case brought under § 1605(a)(1)—which permits actions when "the foreign state has waived its immunity either explicitly or by implication"—a defendant could argue that the plaintiff's allegations, even if accepted as true, do not demonstrate a waiver.  But the defendant could also argue that the alleged waiver did not occur in fact—that, for example, the contract containing the purported waiver is actually a forgery.  If the defendant were correct as a matter of fact, the court would lack jurisdiction.  See Phoenix Consulting, 216 F.3d at 41.

Not without reason, Sudan points to Kilburn v. Socialist People's Libyan Arab Jamahiriya, 376 F.3d 1123 (D.C. Cir. 2004), as an example of how these principles apply to the present litigation.  See Sudan's Aliganga Mem. at 12–13.  The plaintiff in Kilburn sued Libya under § 1605(a)(7), alleging hostage taking, torture, and extrajudicial killing.  376 F.3d at 1125.  After the district court denied Libya's motion to dismiss, Libya pursued two arguments on appeal that are relevant here.  Libya first argued that the plaintiff's allegations, even if true, failed to state a

sufficient "causal connection between the foreign state's alleged acts and the victim's alleged injuries." Id. at 1127.  The D.C. Circuit agreed that "because § 1605(a)(7) is a jurisdictional provision, causation is indeed a jurisdictional requirement," id. (citation omitted), but it concluded that the plaintiff's allegations sufficed to show the necessary degree of causation, id. at 1127–31. Second, and more importantly for present purposes, Libya contested "the factual basis for the district court's jurisdiction." Id. at 1131.  The D.C. Circuit entertained this challenge, weighing the evidence of causation and concluding that the plaintiff's submissions were sufficient to defeat Libya's motion to dismiss.  Id. at 1131–33.

Kilburn thus appears to confirm Sudan's view that whether the Court had subject-matter jurisdiction to enter the judgments in these cases depended in part on whether the plaintiffs introduced enough evidence showing that Sudan provided material support to al Qaeda that was causally connected to the bombings.  And the Court will ultimately explain why, assuming this premise is correct, there was sufficient factual support.  See infra pp. 49–59.  Before doing so, however, the Court will explain why more recent D.C. Circuit decisions persuade the Court that at least some of the plaintiffs in these cases are impervious to Sudan's factual attack on jurisdiction.

In Agudas Chasidei Chabad of U.S. v. Russian Federation, 528 F.3d 934 (D.C. Cir. 2008), the D.C. Circuit addressed the FSIA's expropriation exception to immunity.  That exception removes immunity in any case

> in which [A] rights in property taken in violation of international law are in issue and [B][1] that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or [2] that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States . . . .

28 U.S.C. § 1605(a)(3).  The Chabad court explained that this exception "rest[s] jurisdiction in part on the character of a plaintiff's claim (designated 'A') and in part on the existence of one or

the other of two possible 'commercial activity' nexi between the United States and the defendants (designated 'B')." 528 F.3d at 940.  The alternative requirements in part B, the court continued, "are purely factual predicates independent of the plaintiff's claim, and must . . . be resolved in the plaintiff's favor before the suit can proceed." Id. at 941.  However, part A "does not involve jurisdictional facts, but rather concerns what the plaintiff has put 'in issue,' effectively requiring that the plaintiff assert a certain type of claim." Id.  Critically, "to the extent that jurisdiction depends on the plaintiff's asserting a particular type of claim, and it has made such a claim, there typically is jurisdiction unless the claim is 'immaterial and made solely for the purpose of obtaining jurisdiction or . . . wholly insubstantial and frivolous.'" Id. at 940 (footnote omitted) (quoting Bell v. Hood, 327 U.S. 678, 682–83 (1946)).  In other words, while jurisdiction depended on the plaintiff's proving that one or the other links to commercial activity actually existed, the plaintiff did not have to show that the property was actually "taken in violation of international law"—it merely had to make a non-frivolous claim of such a taking. See id. at 940–41.

Section 1605A(a) contains a two-part structure much like the one Chabad identified in § 1605(a)(3).  Indeed, it is clearer in § 1605A, for it lines up precisely with subsections (a)(1) and (a)(2).  Subsection (a)(1), recall, eliminates immunity in cases

> in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1).  By eliminating immunity in cases where damages are "sought" for a particular kind of injury, this provision "requir[es] that the plaintiff assert a certain type of claim." Chabad, 528 F.3d at 941; see also Robinson v. Gov't of Malaysia, 269 F.3d 133, 149 (2d Cir. 2001) (Sotomayor, J., concurring in the judgment) (proposing similar reading of § 1605(a)(5)).

Subsection (a)(2), by contrast, contains three collateral requirements: that the foreign state was designated a state sponsor of terrorism; that the claimant or victim was a U.S. national, servicemember, or government employee at the relevant time; and that, in certain circumstances, the foreign state was given a chance to arbitrate.  See 28 U.S.C. § 1605A(a)(2)(A)(i)–(iii).  These three requirements are "purely factual predicates" and hence traditional "jurisdictional facts." Chabad, 528 F.3d at 941.

On this reading, a court has jurisdiction only if the three requirements in subsection (a)(2) are actually met.  If, say, it turned out that neither the claimant nor the victim in fact had the necessary U.S. status, the court would lack jurisdiction.  But not so for subsection (a)(1).  The question with respect to subsection (a)(1) is not whether the foreign state actually provided material support for an act of extrajudicial killing, it is merely whether the plaintiff has made a plausible claim that it did.  See Chabad, 528 F.3d at 940.  To analogize to a provision outside the FSIA, subsection (a)(1) is read like the Tucker Act, which gives the Court of Federal Claims "jurisdiction to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States."  28 U.S.C. § 1491(a)(1).  Jurisdiction under this provision, the Federal Circuit has held, does not depend on the plaintiff proving that a contract actually exists—rather, "a non-frivolous allegation of a contract with the government" suffices. Engage Learning, Inc. v. Salazar, 660 F.3d 1346, 1353 (Fed. Cir. 2011); see, e.g., Gould, Inc. v. United States, 67 F.3d 925, 929–30 (Fed. Cir. 1995).

This reading of § 1605A(a) might at first seem inconsistent with Kilburn, which did not simply accept the plaintiff's non-frivolous claim but examined the factual sufficiency of the plaintiff's allegations of torture, extrajudicial killing, and hostage taking.  But a recent D.C. Circuit decision explains how to reconcile the two.  In Simon v. Republic of Hungary, the court explained

that <u>Chabad</u> and subsequent expropriation cases had required only a non-frivolous claim of a taking in violation of international law "because, in those cases, the plaintiff's claim on the merits directly mirrored the jurisdictional standard."  812 F.3d 127, 140 (D.C. Cir. 2016).  That is, those plaintiffs had used the expropriation immunity exception in § 1605(a)(3) to bring a substantive claim of expropriation in violation of international law.  "When the jurisdictional and merits inquiries fully overlap in that fashion, a plaintiff need not prove a winning claim on the merits merely to establish jurisdiction."  <u>Id.</u> at 141.  In <u>Simon</u> itself, by contrast, the "plaintiffs' claim on the merits [was] not an expropriation claim asserting a taking without just compensation in violation of international law.  The plaintiffs instead [sought] recovery based on garden-variety common-law causes of action such as conversion, unjust enrichment, and restitution."  <u>Id.</u>  Because "the jurisdictional and merits inquiries [did] not overlap," the court "ask[ed] for more than merely a non-frivolous argument," instead "assess[ing] whether the plaintiffs' allegations satisfy the jurisdictional standard."  <u>Id.</u>  The court assumed the truth of allegations because the defendants challenged only the complaint's <u>legal</u> sufficiency, but the court noted that the defendants could in theory "challenge the factual basis of those allegations on remand."  <u>Id.</u> at 144.

Simon thus reveals why <u>Kilburn</u> required not just a non-frivolous claim but actual evidence that Libya caused the torture, extrajudicial killing, and hostage taking: because the jurisdictional and merits inquiries did not overlap.  <u>Kilburn</u>, recall, predated the 2008 amendments.  Jurisdiction might have existed under § 1605(a)(7), but there was no corresponding federal cause of action against Libya.  The plaintiff was therefore necessarily going to rely on a substantive cause of action from some other source of law—a cause of action that would not neatly overlap with the jurisdictional grant in § 1605(a)(7).  <u>See</u> 376 F.3d at 1129.

Chabad and Simon suggest a different jurisdictional inquiry here, however—at least with respect to some of the plaintiffs. The substantive law relied on by many of the plaintiffs here was the federal cause of action in § 1605A(c). That provision creates a "claim on the merits [that] directly mirror[s] the jurisdictional standard." Simon, 812 F.3d at 140. It renders foreign states liable to certain plaintiffs "for personal injury or death caused by acts described in subsection (a)(1) of that foreign state . . . for which the courts of the United States may maintain jurisdiction under this section for money damages." 28 U.S.C. § 1605A(c); see also Mot. Hr'g Tr. at 43:14–16 (Sudan's counsel: "I do think that the jurisdictional inquiry and the merits inquiry on causation are conjoined and may be inseparable."). Because "the jurisdictional and merits inquiries fully overlap" in cases brought under § 1605A(c), Simon teaches that plaintiffs invoking that cause of action "need not prove a winning claim on the merits merely to establish jurisdiction." Simon, 812 F.3d at 141. "Rather, the plaintiff need only show that its claim is 'non-frivolous' at the jurisdictional stage, and then must definitively prove its claim in order to prevail at the merits stage." Id. (citing Bell, 327 U.S. at 682 ("If the court does later exercise its jurisdiction to determine that the allegations in the complaint do not state a ground for relief, then dismissal of the case would be on the merits, not for want of jurisdiction.")); cf. Kevin M. Clermont, Jurisdictional Fact, 91 Cornell L. Rev. 973, 1020 (2006) ("On any factual element or legal question of forum authority, . . . if that element or question overlaps the merits of the claim, the proponent need provide only prima facie proof to establish the forum's authority.").

On this reading, there is no doubt that the Court had subject-matter jurisdiction over the claims brought under § 1605A(c). The plaintiffs' claim that Sudan provided material support causally connected to the bombings was nowhere near frivolous. See infra pp. 49–59; Owens III, 531 F.3d 884, 893–954 (D.C. Cir. 2008). Under Chabad and Simon, that was enough to invest the

Court with subject-matter jurisdiction to hear the claims.  See also Williamson v. Tucker, 645 F.2d 404, 415 (5th Cir. 1981) ("Where the defendant's challenge to the court's jurisdiction is also a challenge to the existence of a federal cause of action, the proper course of action for the district court . . . is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case.").  If, as Sudan claims, the plaintiffs failed to put forward sufficient evidence to substantiate those claims, that means only that the Court should have decided against the plaintiffs on the merits, not that it lacked jurisdiction.  Hence, an insufficiency of evidence might render the judgments erroneous, but not void for lack of jurisdiction under Rule 60(b)(4).

Not only is this view of subject-matter jurisdiction under § 1605A supported by the statutory text, Chabad, and Simon, it also has the practical value of simplicity.  "[A]dministrative simplicity is a major virtue in a jurisdictional statute." Hertz Corp. v. Friend, 559 U.S. 77, 94 (2010).  "Complex jurisdictional tests" create a variety of problems, including excessive "appeals and reversals," the danger of "gamesmanship," and—given federal courts' independent obligation to examine the issue—a drain on judicial resources.  Id.; see also Sisson v. Ruby, 497 U.S. 358, 375 (1990) (Scalia, J., concurring in the judgment) (cautioning that "vague boundar[ies]" are "to be avoided in the area of subject-matter jurisdiction wherever possible").  Those problems are avoided by a simple jurisdictional inquiry: is the claim under subsection (a)(1) non-frivolous and are the three requirements in subsection (a)(2) satisfied?  If so, the court has jurisdiction to determine whether a plaintiff can recover under § 1605A(c).

But the claims of the foreign family-member plaintiffs are another matter.  Because those plaintiffs could not invoke § 1605A(c), they relied on District of Columbia tort law, claiming intentional infliction of emotional distress (IIED).  See, e.g., Amduso v. Republic of Sudan, 61 F. Supp. 3d 42, 47–48 (D.D.C. 2014).  IIED is akin to the "garden-variety common-law causes of

action" at issue in <u>Simon</u>, and like them does not "mirror[] the jurisdictional standard."  812 F.3d at 140.  Hence, jurisdiction over these claims requires "more than merely a non-frivolous argument."  <u>Id.</u> at 141.  Instead, as <u>Kilburn</u> also indicates, there must be evidence substantiating the claim under § 1605A(a)(1).  The Court must therefore examine whether the evidence was sufficient to support its jurisdiction.

### B.  The Sufficiency of the Evidence

The fundamental question Sudan's challenge poses is whether the plaintiffs adduced sufficient admissible evidence that Sudan provided "material support or resources" that "caused" the bombings.  <u>See</u> Sudan's D.C. Cir. Br. at 30 (contending that plaintiffs "did not prove that any 'material support or resources' provided by Sudan 'caused' the Embassy bombings."  (quoting 28 U.S.C. § 1605A(a)(1))).  Before elaborating what this inquiry entails, a word about what it does <u>not</u>.  The question is not whether every factual proposition in the Court's 2011 opinion can be substantiated by record evidence admissible under the Federal Rules of Evidence.  Sudan may have plausible arguments that some cannot.  This is hardly surprising: the best safeguard against evidentiary error is an alert adversary raising timely objections—a role Sudan wholly failed to play.  <u>See, e.g.</u>, 1 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 1:5, at 19–20 (4th ed. 2013).  But the fact that particular statements in that opinion may not be adequately supported is irrelevant if there is nonetheless sufficient evidence in the record of the necessary jurisdictional facts.  <u>Cf.</u> <u>Jennings v. Stephens</u>, 135 S. Ct. 793, 799 (2015) ("This Court, like all federal appellate courts, does not review lower courts' opinions, but their <u>judgments</u>."); <u>Wilburn v. Robinson</u>, 480 F.3d 1140, 1148, 1151 (D.C. Cir. 2007) (affirming grant of summary judgment, despite district court's evidentiary error, on alternative ground supported by the record).

Assessing whether the record evidence was sufficient requires, of course, a proper understanding of the parties' respective burdens.  "[T]he FSIA begins with a presumption of immunity, which the plaintiff bears the initial burden to overcome by producing evidence that an exception applies."  Bell Helicopter Textron, Inc. v. Islamic Republic of Iran, 734 F.3d 1175, 1183 (D.C. Cir. 2013).  If the plaintiff satisfies this "burden of production," "the defendant[] will bear the burden of persuasion to establish the absence of the factual basis by a preponderance of the evidence."  Simon, 812 F.3d at 147 (internal quotation marks omitted); accord Chevron Corp. v. Ecuador, 795 F.3d 200, 204 (D.C. Cir. 2015).  The meaning of "burden of production" here is not wholly self-evident, as that term usually refers to the amount of evidence a party must present to allow an issue to go to a jury—a concept not directly applicable in the jury-less context of FSIA cases.  See, e.g., 2 Kenneth S. Broun et al., McCormick on Evidence § 336, at 645 (7th ed. 2013).  But that usual meaning suggests a burden akin to the requirement of "substantial evidence" in administrative law.  See Kay v. FCC, 396 F.3d 1184, 1188 (D.C. Cir. 2005) (noting that substantial evidence "is the amount of evidence constituting enough to justify, if the trial were to a jury, a refusal to direct a verdict" (internal quotation marks omitted)).  The point is: the bar is relatively low.  Yes, the existence of the burden of production means that the plaintiff must provide some evidence that could convince a factfinder of the jurisdictional fact in question.  But because the ultimate burden of persuasion lies with the defendant, in cases where the defendant offers little or no evidence of its own, even a meager showing by the plaintiff will suffice.  It is for this reason that the D.C. Circuit has adverted to the "risk[]" run by a FSIA "defendant that chooses to remain silent."  Simpson v. Socialist People's Libyan Arab Jamahiriya, 470 F.3d 356, 361 (D.C. Cir. 2006) (affirming denial of motion to dismiss); see also Price v. Socialist People's Libyan Arab Jamahiriya, 389 F.3d 192, 199 (D.C. Cir. 2004) (same).  Sudan ran that risk here, offering no

evidence whatsoever at the 2010 hearing.[16]   The question, then, is simply whether the plaintiffs offered enough to satisfy their burden of production.

Although the record contains much else as well, the opinions of the plaintiff's three expert witnesses are enough to satisfy that burden.   Expert opinions are often used in terrorism cases and can be of critical importance.   See, e.g., Boim v. Holy Land Found. for Relief & Dev., 549 F.3d 685, 705 (7th Cir. 2008) (en banc) ("[W]ith [the plaintiff's expert report] in the record and nothing on the other side the [district] court had no choice but to enter summary judgment for the plaintiffs with respect to Hamas's responsibility for the Boim killing."); United States v. Benkahla, 530 F.3d 300, 309–10 (4th Cir. 2008); Simpson, 470 F.3d at 361; United States v. Damrah, 412 F.3d 618, 625 (6th Cir. 2005); Kilburn, 376 F.3d at 1132; Smith ex rel. Smith v. Islamic Emirate of Afghanistan, 262 F. Supp. 2d 217, 228–32 (S.D.N.Y. 2003).   Standard forms of direct evidence are for various reasons difficult, if not impossible, to obtain in terrorism cases.   Terrorist groups and their state sponsors generally wish to hide their activities.   See Kilburn, 376 F.3d at 1129 (noting Congress's recognition that "'material support' of terrorist acts by . . . state sponsors . . . is difficult to trace").   They are unlikely to keep the sorts of records that are crucial in other forms of litigation, see id. at 1130 ("[T]errorist organizations can hardly be counted on to keep careful bookkeeping records."), and even if they did, they generally do not (as Sudan did not here) participate in the discovery process, see Han Kim v. Democratic People's Republic of Korea, 774 F.3d 1044, 1048 (D.C. Cir. 2014) (noting North Korea's refusal "to appear in court and subject itself to discovery").   Security concerns give terrorists and their state sponsors good reason to

---

[16] Sudan did attach two affidavits to its first motion to dismiss in Owens, filed in March 2004.  See Carney Decl. [Owens ECF No. 49-1]; Cloonan Decl. [Owens ECF No. 49-2].  But those affidavits were never part of the record in any of the other cases.  Sudan (obviously) did not attempt to introduce them at the 2010 evidentiary hearing it did not attend, so the plaintiffs had no opportunity or occasion to raise any evidentiary objections they might have had.  And Sudan's own view appears to be that these declarations would have been inadmissible.  See Sudan's Aliganga Mem. at 20.

minimize what any one individual knows of the group's (or state's) larger activities, making knowledgeable firsthand witnesses rare.   And even when such witnesses exist, locating and bringing them into a U.S. court is incredibly difficult.   In light of these circumstances, the opinions of experts who have studied these organizations and their links to state sponsors are extremely useful.   Indeed, given the evidentiary difficulties in terrorism cases, discounting the value of expert testimony "would defeat [§ 1605A's] very purpose: to give American citizens an important economic and financial weapon to compensate the victims of terrorism, and in so doing to punish foreign states who have committed or sponsored such acts and deter them from doing so in the future."   Id. (internal quotation marks, citation, and alterations omitted).   Thankfully, "courts have the authority—indeed . . . the obligation—to adjust evidentiary requirements to differing situations."   Id. (internal quotation marks and alterations omitted).   In the context of § 1605A, that means an obligation to take expert testimony seriously.   See id. at 1049–1051 (relying heavily on the declarations of expert witnesses).

The easiest way to see the weight of the expert evidence here is simply to reproduce the experts' opinions.   First were the conclusions of Evan F. Kohlmann, provided during live testimony at the October 2010 hearing:

> [A]l-Qaeda would not have been able to carry out the 1998 East Africa bombings had it not had a presence in Khartoum, Sudan.  The presence, the safe haven that al-Qaeda had in the Sudan was absolutely integral for its capability of launching operations not just in Kenya, but in Somalia, in Eritrea, in Libya.  Without this base of operations, none of this would have happened.
>
> Al-Qaeda did not have the capability of bringing in resources to that extent into this area.  It did not have a place to base its leadership or its operatives. It did not have a ready supply of passports, of infrastructure.  Sudan was the base for which almost everything that al-Qaeda did in the space between 1992 and 1998 leads back to.  Without the support given by the Sudanese government, the attempted assassination attempt on Hosni Mubarak, the involvement in Somalia, the embassy bombings, none of this would have happened.

. . . .

> [Sudanese government support] was integral [to al-Qaeda's ability to launch the two embassy attacks].   Again, without the base that Sudan provided, without the capabilities provided by the Sudanese intelligence service, without the resources provided, none of this would have happened.  If you look, it's quite clear because of the fact that the vast majority of planning and preparation that went into the al-Qaeda cell in Nairobi took place between the years of 1991 and 1997.  The vast majority of that was done by al-Qaeda operatives transiting back and forth between Nairobi from Khartoum.

> And you can take the words of al-Qaeda operatives themselves.  They label the cell in Nairobi as the key way station that allowed them back and forth into Somalia.  Without Sudan, there never would have been Nairobi, there would have never been a Somalia, there would have never been any of this.  It was absolutely essential, integral.

Evidentiary Hr'g Tr., Oct. 28, 2010 [Owens ECF No. 213] at 317–18.

Next, Dr. Lorenzo Vidino submitted an expert report on "Sudan's State Sponsorship of al Qaeda" that arrived at the following conclusions:

> The twin attacks on the United States Embassies in Nairobi, Kenya, and Dar Es Salaam, Tanzania, were part of a decade-long plan conceived by Osama Bin Laden's terrorist organization, al Qaeda, to attack US interests in the Middle East and East Africa.  Since the end of the 1980s, Bin Laden had worked on creating a worldwide terrorist organization whose main aim was to strike at American targets.

> From 1991 to 1996, Osama Bin Laden and his organization were sheltered and supported by the Sudanese government in Sudan.  During these five years, al Qaeda and the Sudanese government established a deeply intertwined, symbiotic relationship, which required cooperation on many fronts.  Early during its stay in Sudan, al Qaeda publicized its intent to attack American interests.  This was demonstrated by several fatwas and by attacks on US contractors in Riyadh, Saudi Arabia, an attempted attack on US soldiers in Aden, Yemen, as they were en route to Somalia to carry out Operation Restore Hope, and al Qaeda's infamous campaign against the US forces in Somalia during the Operation Restore Hope.  The Sudanese government even facilitated attempted terrorist attacks in the United States.  The Sudanese government can not claim that it allowed Bin Laden to stay in Khartoum but did not know of and support his goals to attack US interests.

> During the years that the Sudanese government sheltered al Qaeda, the organization flourished both financially and militarily. It developed critical ties with several terrorist organizations and trained its operatives who subsequently carried out increasingly sophisticated attacks throughout the world.
>
> The material support that the Sudanese government provided was indispensable, as al Qaeda could not have achieved its attacks on the US Embassies in 1998 if it had not operated in a country that not only tolerated, but actually actively assisted and participated in al Qaeda terrorist activities, despite knowing al Qaeda's intent to attack US interests.

Vidino Report [Amduso ECF No. 288-5] at 34–35. (Vidino's report was introduced as Exhibit V during the October 2010 evidentiary hearing. See Evidentiary Hr'g Tr., Oct. 26, 2010 [Owens ECF No. 212] at 142–43.)

Finally, there was the opinion of Steven Simon, who both submitted an expert report and provided live testimony. In his report he concluded:

> The Republic of Sudan supplied al Qaeda with important resources and support during the 1990s knowing that al Qaeda intended to attack the citizens, or interests of the United States. This support encompassed the safe haven of the entire country for bin Laden and the top al Qaeda leadership. This enabled bin Laden and his followers to plot against the US and build their organization free from US interference. Sudanese shelter enabled Bin Laden to create training camps, invest in—and use—banking facilities, create business firms to provide cover for operatives, generate funds for an array of terrorist groups, provide official documents to facilitate clandestine travel, and enjoy the protection of Sudan's security service against infiltration, surveillance and sabotage.

Simon Report [Amduso ECF No. 288-3] at 5–6. (Simon's report was introduced as Exhibit W-2 during the October 2010 evidentiary hearing. See Evidentiary Hr'g Tr., Oct. 28, 2010, at 343–44.)

And in his live testimony Simon concluded:

> I think it's fair to say that in the absence of the safe haven provided by Sudan to al-Qaeda, that the planning for and the execution of the attacks against those embassies would have been vastly more complicated. I can't say that they would have been impossible, but it's difficult to see how, in the absence of the active support and freedom of action that Bin Laden enjoyed in the Sudan, and the fact that much of the preoperational activities were directed

> from Khartoum, that the attacks could have been carried out with equal
> success.

Evidentiary Hr'g Tr., Oct. 28, 2010, at 344.

It is important to note that the foregoing are the experts' ultimate conclusions—that is, their expert opinions.  Sudan spills a great deal of ink attacking as inadmissible hearsay particular statements the experts made in the course of explaining the bases for their opinions.  See, e.g., Sudan's Aliganga Mem. at 16–17.  But the admissibility of statements along the way is irrelevant if—as the Court concludes—the ultimate opinions themselves are sufficient.[17]  For it is perfectly clear that an expert's opinion need not be based on evidence that is itself admissible.  Fed. R. Evid. 703; see, e.g., Williams v. Illinois, 132 S. Ct. 2221, 2233–35 (2012) (plurality opinion); Simpson, 470 F.3d at 362 & n.1 (discussing expert opinion in FSIA terrorism case).  As Judge Posner ably put the point—in the context of expert testimony concerning terrorism, no less—to confine experts' analysis to admissible evidence alone

> would be a crippling limitation because experts don't characteristically base
> their expert judgments on legally admissible evidence; the rules of evidence
> are not intended for the guidance of experts.  Biologists do not study animal
> behavior by placing animals under oath, and students of terrorism do not
> arrive at their assessments solely or even primarily by studying the records
> of judicial proceedings.

Boim, 549 F.3d at 704; see also Damrah, 412 F.3d at 625 ("'Given the secretive nature of terrorists, the Court can think of few [non-hearsay] materials that experts in the field of terrorism would rely upon.'" (quoting district court)).  Thus, Sudan's contention that the experts' "conclusions are inadmissible because they are based on underlying inadmissible evidence," Reply at 14, is just flat wrong.

---

[17] It would be a different matter if Sudan were attacking a jury verdict on the theory that the revelation of inadmissible evidence underlying an expert's opinion was unduly prejudicial.  See Fed. R. Evid. 703 advisory committee's note to 2000 amendments (noting "the risk of prejudice resulting from the jury's potential misuse of the information for substantive purposes").  But that of course is not the situation here.

Sudan's fallback argument, which makes its first appearance in Sudan's reply brief, is that Kohlmann and Vidino should not have been accepted as experts in the first place.  Reply at 11–13.  (Sudan does not, presumably because it cannot, question the expertise of Simon.)  The proper occasion for such an argument was not Sudan's reply brief, nor even its opening motion for vacatur—it was October 2010.  See Fed. R. Evid. 103(a)(1)(A); Hinds v. Gen. Motors Corp., 988 F.2d 1039, 1046 (10th Cir. 1993) (refusing to consider untimely attack on expert's qualifications).  And even if the merits of this argument deserved consideration, the Court would rule against Sudan.  Sudan is effectively asking the Court to review its own qualification decision.  The Court sees no abuse of discretion.  See Haarhuis v. Kunnan Enters., Ltd., 177 F.3d 1007, 1015 (D.C. Cir. 1999) ("[T]he decision whether to qualify an expert witness is within the broad latitude of the trial court and is reviewed for abuse of discretion.").  That conclusion is bolstered by the fact that both Kohlmann and Vidino have repeatedly been qualified as experts on this or similar subject matter. See, e.g., United States v. Hassan, 742 F.3d 104, 131 (4th Cir. 2014) (Kohlmann); Harrison v. Republic of Sudan, 882 F. Supp. 2d 23, 31 n.10 (D.D.C. 2012) (Vidino).

In sum, the consistent and admissible opinions of these three experts were sufficient to satisfy the plaintiffs' burden of producing evidence that Sudan provided "material support" that "caused" the embassy bombings.  Because Sudan offered nothing—neither evidence nor argument—in response, it failed to carry its "burden of persuasion to establish the absence of the factual basis by a preponderance of the evidence." Simon, 812 F.3d at 147 (internal quotation marks omitted).  The Court therefore had subject-matter jurisdiction to decide the plaintiffs' claims.

Although the Court sees no need to review all of the other evidence the plaintiffs introduced or to respond to all of Sudan's much-belated evidentiary objections, it will address one further

issue, on the chance that its views might assist the D.C. Circuit.  One significant piece of evidence the plaintiffs introduced was a transcript of testimony given in an earlier federal criminal trial by Jamal al-Fadl, a former al Qaeda member who had "served as an intermediary between al Qaeda and the Sudanese intelligence service."  Owens IV, 826 F. Supp. 2d 128, 140 (D.D.C. 2011); see Evidentiary Hr'g Tr., Oct. 26, 2010, at 136–37 (introduction of al-Fadl's prior testimony).  Sudan argues that al-Fadl's prior testimony was inadmissible in its entirety because it was hearsay. Sudan's Aliganga Mem. at 18; Reply at 7–9.  That is incorrect.

To understand why Sudan is wrong, it is important to recall the nature of the 2010 proceeding.  It was not an adversarial trial.  It was an evidentiary hearing to satisfy the FSIA provision that prohibits entry of a default judgment "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e).  Although courts seeking to comply with this requirement often hold hearings featuring live witness testimony, the provision does not actually demand a hearing or live testimony; it demands evidence.  Commercial Bank of Kuwait v. Rafidain Bank, 15 F.3d 238, 242 (2d Cir. 1994) ("[W]e do not believe that § 1608(e) requires evidentiary hearings or explicit findings where the record shows that the plaintiff provided sufficient evidence in support of its claims.").  Courts have accordingly recognized that FSIA plaintiffs seeking a default judgment can proceed by affidavit.  See, e.g., Antoine v. Atlas Turner, Inc., 66 F.3d 105, 111 (6th Cir. 1995); Rafidain Bank, 15 F.3d at 242; Rimkus v. Islamic Republic of Iran, 750 F. Supp. 2d 163, 171 (D.D.C. 2010).  "Affidavits, though usually not admitted into evidence in ordinary trials, are allowed in hearings conducted under 28 U.S.C. § 1608(e) since the hearings are ex parte.  That is, courts have found that there is no reason to require live witness testimony in these hearings because the defendants have failed to enter an appearance in the actions, and, accordingly, would not be there to cross-examine the affiant in open court."  Hutira

v. Islamic Republic of Iran, 211 F. Supp. 2d 115, 124 (D.D.C. 2002).  Thus, for instance, although the district court never held a hearing with live testimony in Han Kim v. Democratic People's Republic of Korea, the D.C. Circuit found sufficient admissible evidence to support a FSIA default judgment in the various affidavits the plaintiffs had submitted.  See 774 F.3d at 1049–51.[18]

In the context of FSIA default proceedings, sworn prior testimony is just as admissible as a sworn affidavit.  An affidavit in which Jane swears, "I saw X," is not meaningfully different from a transcript of a trial in which Jane took the stand and swore, "I saw X."  That is why prior testimony can support a motion for summary judgment just as well as an affidavit can.  E.g., Int'l Distrib. Corp. v. Am. Dist. Tel. Co., 569 F.2d 136, 138 (D.C. Cir. 1977) ("[E]ither an affidavit or a certified transcript of prior testimony may provide the basis for summary judgment.").  Of course, the content of either type of submission could in theory be inadmissible, but they are both equally admissible forms of evidence.  See 11 James Wm. Moore et al., Moore's Federal Practice § 56.91[1]–[3] (3d ed. 2015) (discussing the distinction between admissible content and admissible form).  That is just as true in FSIA default judgment proceedings as in Rule 56 summary judgment proceedings.

Sudan's attack on al-Fadl's prior testimony is a misguided objection to its form, not its content.  If Sudan had shown up in 2010 and gone to trial, it could have demanded that the plaintiffs put al-Fadl on the stand (or fit his prior testimony into a hearsay exception)—but it didn't.  In light of Sudan's default, al-Fadl's prior testimony was a perfectly appropriate form of evidence.  By the same logic, Sudan's hearsay objections to the deposition testimony of Essam al-Ridi and the plea hearing testimony of Ali Mohamed also fail.  See Sudan's Aliganga Mem. at 19; Reply at 14.  The

---

[18] That the district court did not hold a hearing with live testimony is evident from the district court docket entries and the various filings in both the district court and the D.C. Circuit.

consideration of all three sets of testimony was proper.  And any objection to aspects of the <u>content</u> of that testimony should have—as is true of so many of Sudan's arguments—been raised long ago.

In sum, the Court had jurisdiction to hear claims brought under § 1605A(c) because that cause of action directly mirrors the jurisdictional standard in § 1605A(a) and the plaintiffs' claims were not frivolous.  Jurisdiction to hear the state-law claims depended on the plaintiffs' producing admissible evidence that Sudan provided "material support or resources" that "caused" the bombings.  The plaintiffs met their burden of production by offering the three expert opinions (as well as the testimony of al-Fadl and others), and Sudan failed to carry its burden of persuasion. The Court therefore had a sufficient factual basis for jurisdiction to hear all of the plaintiffs' claims.

### RULE 60(b)(4): "INDIRECT" VICTIMS CAN SUE UNDER § 1605A

Sudan's final jurisdictional argument is that § 1605A does not provide subject-matter jurisdiction for the claims of "indirect" victims, that is, immediate family members of those physically injured or killed in the bombings, who have claimed emotional injuries stemming from the attacks.  Subsection (a)(1) of § 1605A is limited to cases in which damages are sought "for personal injury or death," and in Sudan's view "personal injury" requires bodily harm.  Sudan's Aliganga Mem. at 26–27.  Sudan also relies on subsection (a)(2), which (among other things) requires that at the time of the predicate act "the claimant or the victim was" a U.S. national, a member of the U.S. armed forces, or a U.S. government employee.   28 U.S.C. § 1605A(a)(2)(A)(ii).  In Sudan's view, this indicates that claims can be brought only by the direct "victim" or by a legal representative ("claimant") on the victim's behalf if the victim is killed or incapacitated.  Reply at 15–16; Sudan's D.C. Cir. Br. at 46–48.  Sudan also points to the district court opinion in <u>Cicippio Puleo v. Islamic Republic of Iran</u>, which concluded (correctly, in Sudan's estimation) that "Congress did not intend the FSIA to so enlarge the scope of potential liability of

sovereign foreign states—even 'terrorist' states—to require them to compensate non-victim plaintiffs for damages."  2002 WL 34408105, at *3 (D.D.C. June 21, 2002); see Sudan's Aliganga Mem. at 25–26; Sudan's D.C. Cir. Br. at 48–49.

The short answer to this argument is that it is foreclosed by precedent.  In fact, it is the Cicippio-Puleo case that forecloses it.  That action was brought by family members of Joseph J. Cicippio, Sr., who had been taken hostage and held for years by Hezbollah.  The plaintiffs sued Iran under § 1605(a)(7), alleging emotional injuries stemming from Cicippio's captivity.  As Sudan notes, the district court dismissed the case, both for failure to state a claim and for lack of jurisdiction.  Cicippipo Puleo, 2002 WL 34408105, at *2 ("dismiss[ing] the complaint pursuant to Fed. R. Civ. P. 12(b)(6) and 12(h)(3)").  But Sudan ignores what happened on appeal.  After noting that the district court had dismissed on these two alternative grounds, the D.C. Circuit said: "The second ground is inapposite, for it is clear that the District Court had jurisdiction pursuant to the statutory waiver of sovereign immunity under 28 U.S.C. § 1605(a)(7)."  Cicippio-Puleo v. Islamic Republic of Iran, 353 F.3d 1024, 1030 (D.C. Cir. 2004).  That is, it was "clear" that § 1605(a)(7) provided jurisdiction to family members suing for intentional infliction of emotional distress (IIED).  The D.C. Circuit went on to hold that the plaintiffs lacked a cause of action under the Flatow Amendment (thus affirming the district court in part), but because it held that there was jurisdiction under § 1605(a)(7), it remanded the case "to allow plaintiffs an opportunity to amend their complaint to state a cause of action under some other source of law."  Id. at 1036.  Thus, the D.C. Circuit has squarely held that § 1605(a)(7) provided jurisdiction for family members' claims.  This holding cannot be waved off as unconsidered: this was an issue of subject-matter jurisdiction, which the court surely knew it must consider carefully.  Moreover, the court received briefing that directly addressed whether IIED fit within § 1605(a)(7)'s terms.  See Br. for Appointed Amicus

Curiae at 26–27, <u>Cicippio-Puleo</u>, 353 F.3d 1024 (No. 02-7085), 2003 WL 25585771.[19]  Because

the language of § 1605A(a) is not different from the language of § 1605(a)(7) in any relevant

way—and nothing suggests the enactment of § 1605A(a) was intended to <u>expand</u> immunity—

Sudan's argument that the Court lacked jurisdiction to hear family members' claims must be

rejected.

     <u>Cicippio-Puleo</u>'s conclusion, moreover, is correct as a matter of statutory interpretation.

Sudan thinks not, in part (as noted earlier) because it thinks "personal injury" means only physical

bodily injury.  But "personal injury" does not usually receive so narrow an interpretation.  Indeed,

four years before § 1605(a)(7) was enacted, the Supreme Court interpreted the term as used in a

tax code provision to encompass "nonphysical injuries to the individual, such as those affecting

emotions, reputation, or character," an interpretation it deemed "in accord with common judicial

parlance and conceptions" of the term.   <u>United States v. Burke</u>, 504 U.S. 229, 235 n.6 (1992).

<u>Burke</u> relied in part on the sixth edition of Black's Law Dictionary, which observed that the

"narrow sense" of "personal injury" is bodily injury, but the "wider sense," found "usually in

statutes," includes "any injury which is an invasion of personal rights, and in this signification it

may include such injuries to the person as . . . mental suffering."  Black's Law Dictionary 786 (6th

ed. 1990) (defining various types of "injury").  And IIED is commonly described as a "personal

injury" claim.  <u>See, e.g.</u>, <u>Leach v. Taylor</u>, 124 S.W.3d 87, 91 (Tenn. 2004); <u>Hawkes v. Commercial</u>

<u>Union Ins. Co.</u>, 764 A.2d 258, 264 (Me. 2001); <u>Curtis v. Firth</u>, 850 P.2d 749, 752 (Idaho 1993);

<u>Luddeke v. Amana Refrigeration, Inc.</u>, 387 S.E.2d 502, 504 (Va. 1990).  Still, says Sudan,

---

[19] And the court concluded likewise in <u>Oveissi v. Islamic Republic of Iran</u>, 573 F.3d 835 (D.C. Cir. 2009).
There, the grandson of a former Iranian general who was assassinated by Hezbollah sued Iran under the FSIA, alleging
IIED and wrongful death.  Although the D.C. Circuit remanded the case without determining whether the plaintiff had
viable causes of action, it noted that "the district court correctly determined that it had jurisdiction over the plaintiff's
suit under the terrorism exception of the FSIA," <u>i.e.</u>, § 1605(a)(7).  573 F.3d at 840.

"personal injury" could mean only bodily injury, and any ambiguity in § 1605A should be construed narrowly, in favor of its immunity. Sudan's Aliganga Mem. at 26–29. But the D.C. Circuit has rejected such a rule of narrow construction (albeit in a decision that was later reversed on other grounds). See Simon v. Republic of Iraq, 529 F.3d 1187, 1196 (D.C. Cir. 2008) ("[N]or are we aware of any case in which a court presumed or suggested exceptions to foreign sovereign immunity should be construed narrowly."), rev'd on other grounds sub nom. Republic of Iraq v. Beaty, 556 U.S. 848 (2009). Interpretation of § 1605A proceeds "unencumbered by any special canons of construction," id., and the better reading is that "personal injury" includes emotional injuries of the sort the family members suffered.

Nor is the Court persuaded by Sudan's argument that the only possible "claimant" apart from the "victim" directly injured by the incident is a legal representative of that "victim." Reply at 15–16; Sudan's D.C. Cir. Br. at 46–48. No doubt "claimant" can encompass the legal representative of a direct victim who has been killed or incapacitated. But it seems strange to limit "claimant" to only that meaning, given that in the cause of action in § 1605A(c)—enacted at the same time as § 1605A(a)—Congress specifically used the term "legal representative." 28 U.S.C. § 1605A(c)(4); see Sosa v. Alvarez-Machain, 542 U.S. 692, 711 n.9 (2004) (noting the "usual rule" that differences of language within a statute indicate differences of meaning). The more natural reading is that "claimant" means whoever is bringing the claim under § 1605A(a). Subsection (a)(2), after all, is devoted to explaining the circumstances in which "[t]he court shall hear a claim under this section." 28 U.S.C. § 1605A(a)(2). And because IIED is a claim that fits within subsection (a)(1), the Court sees no reason why the "claimant"/"victim" language in subsection (a)(2) forecloses jurisdiction over family members' claims. The far more obvious function of subsection (a)(2) is to ensure that only claims with a connection to a U.S. national,

servicemember, or government employee can be heard.  That function is not undermined by allowing family members' claims.  See Oveissi v. Islamic Republic of Iran, 573 F.3d 835, 840 (D.C. Cir. 2009) (finding jurisdiction under § 1605(a)(7) for suit alleging IIED by U.S. grandson of assassinated Iranian general, and describing grandson as "the claimant"); see also Leibovitch v. Islamic Republic of Iran, 697 F.3d 561, 568–72 (7th Cir. 2012) (finding jurisdiction under § 1605A for family members' claims).

### RULE 60(b)(6): THE COURT WILL NOT VACATE FOREIGN FAMILY MEMBERS' JUDGMENTS

Sudan's next argument is that, even if § 1605A(a) gave the Court subject-matter jurisdiction to hear the claims of victims' family members, those family-member plaintiffs who are foreign nationals did not have a valid cause of action.  That is so, Sudan argues, for two independent reasons.  First, § 1606, which Sudan characterizes as a "gateway" through which FSIA plaintiffs must pass to access substantive law, does not cross-reference § 1605A, but only §§ 1605 and 1607.  According to Sudan, this means that the only cause of action available to plaintiffs proceeding under § 1605A(a) is the one in § 1605A(c), and that cause of action (as this Court has held) is not available to foreign plaintiffs.  Sudan's Aliganga Mem. at 29–30; see also Owens IV, 826 F. Supp. 2d 128, 151–53 (D.D.C. 2011).  Second, Sudan argues that even if the foreign family members could access D.C. law—the substantive law this Court held would apply to those plaintiffs, see Owens IV, 826 F. Supp. 2d at 153–57—they failed to state viable IIED claims because they did not personally witness (or at least contemporaneously perceive) their direct-victim relatives suffer their injuries.  Sudan's Aliganga Mem. at 30–32.  And because the foreign family members did not have a valid cause of action, Sudan says, their judgments should be vacated under Rule 60(b)(6).  Id. at 32.

Sudan completely fails, however, to explain why these nonjurisdictional arguments, even if correct, would justify relief under Rule 60(b)(6).  As noted earlier, that provision, which follows the more specific circumstances identified in subsections (b)(1) through (b)(5), allows a court to vacate a final judgment for "any other reason that justifies relief."   "[R]elief under Rule 60(b)(6) . . . requires a showing of 'extraordinary circumstances.' " Gonzalez v. Crosby, 545 U.S. 524, 536 (2005); accord Kramer v. Gates, 481 F.3d 788, 792 (D.C. Cir. 2007) (noting "that Rule 60(b)(6) should be only sparingly used" and requires movants to "clear a very high bar to obtain relief" (internal quotation marks omitted)).  Sudan provides no authority suggesting that the mere existence of a nonjurisdictional legal error is such an extraordinary circumstance.  Precedent suggests the contrary.  In Gonzalez, for instance, the Supreme Court said that a district court's (assumedly) "incorrect" dismissal, based on circuit precedent later held to be erroneous, did not amount to extraordinary circumstances under Rule 60(b)(6).  545 U.S. at 536.  And the D.C. Circuit has noted that "a dispute over the proper interpretation of a statute does not qualify as an extraordinary circumstance under Rule 60(b)(6)."  Carter v. Watkins, 995 F.2d 305, 1993 WL 210853, at *2 (D.C. Cir. 1993) (per curiam) (table); see also, e.g., Pierce v. United Mine Workers of Am. Welfare & Ret. Fund for 1950 & 1974, 770 F.2d 449, 451 (6th Cir. 1985) ("Because of the residual nature of Rule 60(b)(6), a claim of simple legal error, unaccompanied by extraordinary or exceptional circumstances, is not cognizable under Rule 60(b)(6)."); Elgin Nat'l Watch Co. v. Barrett, 213 F.2d 776, 779–80 (5th Cir. 1954) ("The mere fact that the judgment was erroneous does not constitute 'any other reason justifying relief' from it." (footnote omitted)).

If the mere fact of nonjurisdictional error can ever be the basis for Rule 60(b) relief, it should be limited to instances of clear or obvious error, or (perhaps) where the controlling law has changed after the entry of judgment.  See Van Skiver v. United States, 952 F.2d 1241, 1244 (10th

Cir. 1991) (relief based on "mistake" of law under Rule 60(b)(1) "is available only for obvious errors of law"); <u>Alvestad v. Monsanto Co.</u>, 671 F.2d 908, 913 (5th Cir. 1982) (similar); <u>Ctr. for Nuclear Responsibility, Inc. v. U.S. Nuclear Regulatory Comm'n</u>, 781 F.2d 935, 940 (D.C. Cir. 1986) (correction of legal errors permitted under Rule 60(b)(1), at least during the appeal period, "where the controlling law of the circuit had changed between the time of the judgment and the time of the motion").[20]  (Even under the more forgiving Rule 59(e) standard, relief need not be granted absent "an intervening change of controlling law, the availability of new evidence, or the need to correct a <u>clear</u> error or prevent <u>manifest</u> injustice."  <u>Patton Boggs LLP v. Chevron Corp.</u>, 683 F.3d 397, 403 (D.C. Cir. 2012) (emphasis added) (internal quotation marks omitted).)  There is no suggestion here of any change in controlling law.  And Sudan has not identified clear or obvious errors.

Start with Sudan's contention that § 1605A(c) provides the only cause of action available to plaintiffs proceeding under the jurisdictional grant in § 1605A(a).  As noted, the premise underlying this argument is that in order to access substantive law outside the FSIA, a plaintiff needs the "gateway" of § 1606, and § 1606 refers only to claims brought under §§ 1605 or 1607, not § 1605A.  Sudan's Aliganga Mem. at 29–30.  But § 1606 (reproduced in full in the margin[21])

---

[20] As these citations suggest, those courts that have held that legal error alone can justify relief from a final judgment have usually done so under Rule 60(b)(1).  <u>See generally</u> 11 Charles Alan Wright et al., Federal Practice and Procedure § 2858.1 (3d ed. 2012).  Sudan has made no argument of this sort, and would have been time-barred from doing so in <u>Mwila</u> and <u>Khaliq</u>.  <u>See</u> Fed. R. Civ. P. 60(c)(1) (requiring motions under Rule 60(b)(1) to be brought no more than one year after the entry of judgment).

[21] Section 1606 ("Extent of liability") provides:

> As to any claim for relief with respect to which a foreign state is not entitled to immunity under section 1605 or 1607 of this chapter, the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances; but a foreign state except for an agency or instrumentality thereof shall not be liable for punitive damages; if, however, in any case wherein death was caused, the law of the place where the action or omission occurred provides, or has been construed to provide, for damages only punitive in nature, the foreign state shall be liable for actual or compensatory damages measured by the pecuniary injuries resulting from such death which were incurred by the persons for whose benefit the action was brought.

does not by its terms create an exclusive "gateway" through which a plaintiff must pass in order to access substantive law. The section does not grant access to substantive law, or even define what substantive law applies to claims brought under the FSIA. See Oveissi, 573 F.3d at 841 ("The FSIA does not contain an express choice-of-law provision."). Instead, as suggested by its title, "Extent of liability," § 1606 places certain limits on the liability that the applicable substantive law—whatever its source—can impose on the foreign sovereign. True, courts have relied in part on § 1606 in deciding what choice-of-law rules to apply in FSIA cases, see id., but that does not make § 1606 the indispensable "gateway" that Sudan envisions.

To put the point another way, imagine if § 1606 were deleted entirely: would that mean FSIA plaintiffs proceeding under the jurisdiction provided by § 1605 would have no access to substantive law? The Court thinks not. It is aware of no authority suggesting that a grant of subject-matter jurisdiction is a nullity if Congress fails to expressly define the substantive law that applies. Early Supreme Court decisions repeatedly avowed that even if the first Congress had not enacted the Rules of Decision Act—which instructed federal courts to use state laws as rules of decision in certain circumstances, see Judiciary Act of 1789, ch. 20, § 34, 1 Stat. 73, 92 (codified as amended at 28 U.S.C. § 1652)—federal courts would have the obligation (and a fortiori the ability) to apply state law to cases within their jurisdiction. See Hawkins v. Barney's Lessee, 30 U.S. (5 Pet.) 457, 464 (1831) ("[The Rules of Decision Act] has been uniformly held to be no more than a declaration of what the law would have been without it: to wit, that the lex loci must be the governing rule of private right, under whatever jurisdiction private right comes to be examined."); Bank of Hamilton v. Dudley's Lessee, 27 U.S. (2 Pet.) 492, 525 (1829) (observing that state law would "be regarded as a rule of decision in the courts of the United States . . . independent of" the

---

28 U.S.C. § 1606.

Rules of Decision Act); see also Agency Holding Corp. v. Malley-Duff & Assocs., Inc., 483 U.S. 143, 161–63 (1987) (Scalia, J., concurring in the judgment).  Hence, it appears that even if § 1606 did not exist at all, federal courts could still adjudicate cases falling within the subject-matter jurisdiction provided by the FSIA.  They would continue to do what they do now: use the choice-of-law rules of the state in which they sit to determine the applicable substantive law.  See Oveissi, 573 F.3d at 841; cf. 19 Charles Alan Wright et al., Federal Practice and Procedure § 4520 (2d ed. 1996) (discussing the application of state law by federal courts in nondiversity cases).  The upshot is that Congress's failure to add a cross-reference to § 1605A in § 1606 does not block state law from applying to claims for which subject-matter jurisdiction is provided by § 1605A(a).  It merely means that the special rules of liability in § 1606 do not apply to claims arising under § 1605A(a).

That brings us to Sudan's second argument: that the foreign family members failed to state viable IIED claims under D.C. law.  Sudan argues that D.C. law would not allow recovery for IIED unless these plaintiffs had been present at the time of, or at least had contemporaneously perceived, the outrageous conduct (i.e., the bombings).  But Sudan cannot point to a decision by the D.C. Court of Appeals that actually imposes a bright-line presence requirement.  True, Sudan can and does point to a D.C. Circuit decision that reads D.C. tort law in this way: Pitt v. District of Columbia, which said that "under D.C. tort law, a family member can only recover for IIED if she was 'present' when the extreme or outrageous conduct took place."  491 F.3d 494, 507 (D.C. Cir. 2007).  But with all due respect, this Court does not believe Pitt clearly controls under the circumstances here.  Pitt noted that the District of Columbia had adopted the IIED standard laid out in the Restatement (Second) of Torts, which does suggest that presence is usually required for family-member plaintiffs.  See id.  But the Restatement also contains a "Caveat" that leaves open "whether there may not be other circumstances under which the actor may be subject to liability

for the intentional or reckless infliction of emotional distress," and more specifically "leave[s] open the possibility of situations in which presence at the time may not be required." Restatement (Second) of Torts § 46, Caveat (1965); id. § 46, cmt. *l*. Relying on this Caveat, courts in this district have held that terrorist attacks are a form of outrageous conduct to which the presence requirement should not apply. See, e.g., Estate of Heiser v. Islamic Republic of Iran, 466 F. Supp. 2d 229, 328 (D.D.C. 2006) ("[A] terrorist attack is precisely the sort of situation in which presence at the time is not required in light of the severity of the act and the obvious range of potential grief and distress that directly results from such a heinous act.") (applying New Hampshire law, which follows the Restatement). The D.C. Court of Appeals has never addressed the Restatement's Caveat or an IIED claim arising out of terrorism, and nor did the D.C. Circuit in Pitt. This Court therefore does not find it clear that D.C. law would require the foreign family-member plaintiffs to have been present at the bombings. And even if it is ultimately determined that D.C. law does require presence under these circumstances, the Court's error on this open and debatable point of law is not, for the reasons discussed earlier, a basis under Rule 60(b) for vacating the judgments.

One might wonder, the Court recognizes, whether it makes sense to apply the demanding Rule 60(b) standard to Sudan's nonjurisdictional arguments, given that Sudan filed timely notices of appeal. That is, one might think that if Sudan will get to raise these nonjurisdictional arguments in its direct appeal of the judgments, then for efficiency's sake this Court should give them plenary consideration in the first instance. But, for one thing, there is simply no authority suggesting, nor does Sudan contend, that the Court has discretion to apply anything but the Rule 60(b) standard here, regardless of what concern for judicial efficiency might suggest. Moreover, Sudan's nonjurisdictional arguments will likely not receive plenary consideration on appeal either. Arguments not raised in the district court are generally forfeit on appeal. E.g., Benoit v. U.S. Dep't

of Agric., 608 F.3d 17, 21 (D.C. Cir. 2010).  If the D.C. Circuit agrees that Sudan's default was inexcusable, this forfeiture rule would seem to apply.  Hence, this Court does not believe it is reviewing any of Sudan's arguments under a standard more demanding than what Sudan will face on appeal.

### RULE 60(b)(6): THE COURT WILL NOT VACATE THE PUNITIVE DAMAGES AWARDS

Sudan also challenges the judgments in Wamai, Amduso, Onsongo, and Opati insofar as they included awards of punitive damages, which Sudan says were not available to any plaintiffs. Punitive damages were not available to foreign family-member plaintiffs, Sudan argues, because the only mechanism for obtaining punitive damages under the FSIA is the cause of action in § 1605A(c), which has never been available to foreign family members.  Mem. Supp. Mot. to Vacate [Amduso ECF No. 285-1] ("Sudan's Amduso Mem.") at 25.  And as for those plaintiffs properly proceeding under § 1605A(c), Sudan contends that § 1605A(c) should not be read to authorize punitive damages for pre-enactment conduct, lest it run afoul of the Ex Post Facto Clause.  Reply at 20–22.  Hence, says Sudan, the punitive damages portions of these judgments should be vacated under Rule 60(b)(6).  Sudan's Amduso Mem. at 25.

But Sudan has once again completely failed to explain why these arguments, even if persuasive, come within the ambit of Rule 60(b)(6).  Like the arguments discussed in the preceding section of this opinion, these are claims of nonjurisdictional legal error.  And for the reasons explained in that section, error by itself—unless, perhaps, it is obvious—is not an extraordinary circumstance.  The fact that one of Sudan's arguments has a constitutional component does not alter the analysis.  Constitutional arguments are generally subject to forfeiture and waiver just like any other legal argument, see, e.g., Al Bahlul v. United States, 767 F.3d 1, 8–10 (D.C. Cir. 2014) (en banc) (forfeiture of ex post facto argument); United States v. Behrman, 235 F.3d 1049, 1051–

52 (7th Cir. 2000) (guilty pleas can waive constitutional arguments), and the Court is aware of no authority suggesting that claims of constitutional error render final judgments more susceptible to reopening under Rule 60(b)(6).

One might wonder whether the sheer magnitude of the punitive damages awarded here—billions of dollars—is an extraordinary circumstance. But, although Sudan <u>mentions</u> the size of the awards, <u>see</u> Sudan's <u>Amduso</u> Mem. at 25, it does not argue that this is relevant to Rule 60(b)(6)—perhaps because there is no authority to that effect. This Court has found no precedent suggesting that the magnitude of a damages award can itself be an extraordinary circumstance that would justify relief from the judgment. Consistent with the general thrust of Rule 60(b), courts applying Rule 60(b)(6) have largely focused on flaws in the adjudicatory <u>process</u>—such as fraud, lack of actual notice, or a party's disability—not on the nature or scope of the relief awarded. <u>See</u> 12 James Wm. Moore et al., Moore's Federal Practice § 60.48[3][b], [4][a] (3d ed. 2015). Once again, then, Sudan has failed to persuade the Court that its arguments—however strong they might have been if presented at the appropriate time—justify vacating the judgments.

In fairness to Sudan, however, and in case it might assist the D.C. Circuit (if it reviews this issue), the Court must acknowledge the apparent strength of Sudan's underlying arguments about the unavailability of punitive damages. Take first Sudan's argument regarding punitive damages under § 1605A(c). As Sudan correctly notes, there is a "presumption against retroactive legislation [that] is deeply rooted in our jurisprudence, and [that] embodies a legal doctrine centuries older than our Republic." <u>Landgraf v. USI Film Prods.</u>, 511 U.S. 244, 265 (1994). A statute will not be interpreted to "impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed . . . absent clear congressional intent favoring such a result." <u>Id.</u> at 280; <u>see also</u> <u>Lindh v. Murphy</u>, 521 U.S. 320,

325 (1997) (noting "the traditional rule requiring retroactive application to be supported by a clear statement").  Before the enactment of the 2008 NDAA, Sudan was not subject to punitive damages for the conduct at issue in these cases.  See 28 U.S.C. § 1606 ("a foreign state . . . shall not be liable for punitive damages" for claims under § 1605); Owens I, 374 F. Supp. 2d 1, 25–26 (D.D.C. 2005).  It would therefore only be appropriate to interpret the amendments in the 2008 NDAA as authorizing punitive damages for that same behavior—thereby "increas[ing Sudan's] liability for past conduct"—if there is a clear statement of that intent.

The Court does not see such a clear statement.  The plaintiffs argue that because "§ 1605A(b) permits retroactive § 1605A(c) claims 'under this section' and subsection (c) provides for punitive damages, Congress has unequivocally expressed its intent that punitive damages have a retroactive effect under § 1605A."  Pls.' Surreply [Amduso ECF No. 294-1] at 2.[22]  But the mere fact that Congress has authorized plaintiffs to bring § 1605A(c) claims on the basis of pre-2008 conduct is not a clear statement that punitive damages are available for that subset of claims.  If § 1605A(c) said, "Punitive damages are available in all actions brought under this subsection," the Court might agree with the plaintiffs.  But as Sudan notes, it says only that an award "may include . . . punitive damages."  28 U.S.C. § 1605A(c) (emphasis added).  That language does not compel the conclusion that punitive damages are available for pre-enactment conduct.

The plaintiffs also point to Arnold v. Islamic Republic of Iran, 787 F. Supp. 2d 37, 42 (D.D.C. 2011), which discusses the retroactive effect of the 2008 amendments.  Pls.' Surreply at 2.  Arnold did say that the punitive damages provision in § 1605A(c) should be applied

---

[22] The plaintiffs in the four cases in which punitive damages were awarded have moved for leave to file surreplies addressing this issue of retroactivity and three other issues.  See, e.g., Pls.' Mot. for Leave to File Sur-Reply [Amduso ECF No. 294] at 2–3.  Sudan does not oppose the plaintiffs' request insofar as it relates to this one issue.  The Court will grant the plaintiffs leave to file those portions of their surreplies that address this issue, but not the portions that address the other three issues.

retroactively in some cases, but it based that conclusion not on any clear statement in § 1605A itself, but rather on the particular language in § 1083(c)(2) of the 2008 NDAA, the provision allowing the conversion of pending § 1605(a)(7) actions.  787 F. Supp. 2d at 43 (noting that "the NDAA instructs courts to treat a case converted into a § 1605A suit under that section [i.e., § 1083(c)(2)] 'as if the action had originally been filed' under § 1605A" (quoting 28 U.S.C. §1083(c)(2)(A)).   Arnold expressly distinguished "related actions" brought pursuant to § 1083(c)(3), which it said "lacks any express directive" regarding retroactivity.  Id. at 45.  Arnold may or may not be correct about § 1083(c)(2), but since none of the four actions at issue here were brought under that provision, Arnold does not help the plaintiffs here in any event.

In connection with this dispute over retroactivity, Sudan and the plaintiffs spar over the applicability of the Ex Post Facto Clause.  Sudan says the retroactive imposition of punitive damages might very well violate that provision of the Constitution.  See Landgraf, 511 U.S. at 281 ("Retroactive imposition of punitive damages would raise a serious constitutional question.").  The plaintiffs contend, however, that a foreign sovereign like Sudan "cannot avail itself of the U.S. Constitution to object to punitive damages."  Pls.' Surreply at 3.  The plaintiffs raise an interesting question: do foreign sovereigns have standing (so to speak) to object when Congress exceeds its Article I authority?  On the one hand, the D.C. Circuit has held that a foreign sovereign is not a "person" protected by the Fifth Amendment, observing along the way that "legal disputes between the United States and foreign governments are not mediated through the Constitution."  Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 96–97 (D.C. Cir. 2002); see also Lori Fisler Damrosch, Foreign States and the Constitution, 73 Va. L. Rev. 483, 489, 515–34 (1987) (arguing that foreign states' "constitutional claims against the actions of the federal political branches must fail on the merits because of the relationship of foreign states to the federal

structure," id. at 489). On the other hand, the D.C. Circuit has at least once—in this litigation, no less—addressed on the merits an Article I argument by a foreign sovereign, never suggesting the sovereign had no right to make it. See Owens III, 531 F.3d 884, 888–93 (D.C. Cir. 2008) (rejecting Sudan's contention that aspects of the FSIA violate the nondelegation doctrine). Ultimately, however, the Court does not think the applicability of the Ex Post Facto Clause is dispositive, for as Sudan rightly notes, the interpretive presumption that statutes affecting substantive rights are nonretroactive is a general legal principle not dependent on the Constitution. See Landgraf, 511 U.S. at 265 & n.17. And the fact that the Supreme Court has wrestled with how this presumption applies to the FSIA generally, see Republic of Austria v. Altmann, 541 U.S. 677, 692–702 (2004), shows that it is fully applicable to cases involving foreign sovereigns. Here, that presumption leaves the Court with serious doubt about whether § 1605A(c) should be read as authorizing punitive damages for pre-enactment conduct.

The Court has equally serious doubt about whether the foreign family-member plaintiffs could receive punitive damages. As Sudan notes, the Court's only explanation for its award of punitive damages was § 1605A(c), see, e.g., Amduso v. Republic of Sudan, 61 F. Supp. 3d 42, 51–53 (D.D.C. 2014), but the foreign family-member plaintiffs were not (and could not have been) bringing claims under that provision. They were instead bringing claims under state law. Could the punitive damages nonetheless have been justified under state law? Sudan says no, relying on the FSIA's general prohibition on the award of punitive damages against a foreign state. But that prohibition is contained in § 1606, and as Sudan itself highlights in the context of its "gateway" argument (see supra p. 65), § 1606 does not apply to claims brought under § 1605A. See Sudan's Amduso Mem. at 23 ("By its terms, § 1606 pertains only to §§ 1605 and 1607, not § 1605A."). Sudan does not get to selectively apply § 1606 to § 1605A when it helps but not when it hurts.

Hence, as a general matter, the Court does not see why a plaintiff bringing state-law claims through the jurisdiction provided by § 1605A(a) cannot obtain punitive damages against a foreign state (assuming such damages are warranted under state law, of course).

In these cases, however, there remains the problem of retroactivity. If state-law punitive damages are indeed now available against foreign sovereigns, it is the 2008 NDAA that made this so, by creating a new jurisdictional provision, § 1605A(a), that is unconstrained by the liability limitations of § 1606. This "increase[d] a party's liability for past conduct," Landgraf, 511 U.S. at 280; at the time of Sudan's conduct, it was not subject to punitive damages in any American court, but now (on this reading) it would be. The presumption against retroactivity thus again directs a court not to give the 2008 NDAA that construction absent a clear statement. (By contrast, a change merely in the scope of the jurisdiction the FSIA provides would not be subject to the presumption against retroactivity. Republic of Iraq v. Beaty, 556 U.S. 848, 864 (2009).) And if there was no clear statement of retroactivity with respect to the express authorization of punitive damages by § 1605A(c), there is certainly no clear statement with respect to the 2008 NDAA's implicit authorization of state-law punitive damages under § 1605A(a).

In sum, the Court now has significant doubt about whether any of the punitive damages awards in these cases involving conduct predating the 2008 NDAA were proper. It is not certain they were improper, however—the parties' briefing of these complex issues is rather scant—and to return to the critical point, Sudan has provided no authority suggesting that such error alone is a proper basis for vacating the judgments. Perhaps the D.C. Circuit will expand the range of circumstances in which legal error justifies vacatur, cf. Ctr. for Nuclear Responsibility, Inc. v. U.S. Nuclear Regulatory Comm'n, 781 F.2d 935, 940 (D.C. Cir. 1986) (leaving open whether "to allow corrections of substantive legal errors where no . . . change in the law of the circuit has occurred"

under Rule 60(b)<u>(1)</u>), but this Court will not do so on its own.  Even with its doubts, then, the

Court will not vacate the punitive damages awards, which at most entail nonjurisdictional legal

error not amounting to an "extraordinary circumstance" within the ambit of Rule 60(b)(6).

## <u>CONCLUSION</u>

For all of the foregoing reasons, the Court will deny Sudan's motions to vacate the

judgments in each of these cases.  <u>See</u> Fed. R. Civ. P. 62.1(a)(2) (authorizing the denial of relief

when an appeal is pending).  A separate order will issue today in each case.


_____/s/_____

JOHN D. BATES
United States District Judge

Dated:  <u>March 23, 2016</u>